[No. B007404. Second Dist., Div. Six. Aug. 25, 1986.]

CHRISTOPHER BARAJAS, Plaintiff and Respondent, v.
USA PETROLEUM CORPORATION, Defendant and Appellant.

HARRY STALLINGS, Plaintiff and Respondent, v.
USA PETROLEUM CORPORATION, Defendant and Appellant.

REAGEN'S VACUUM TRUCK SERVICE, INC., et al.,
Plaintiffs and Respondents, v.
USA PETROLEUM CORPORATION, Defendant and Appellant.

**COUNSEL**

Byers, Hoff & Lyden, D. Michael Lyden and Edward J. Horowitz for Defendant and Appellant.

Eugene W. Comroe, Fourt & Schechter, Thomas Lisle Schechter, Halde, Thomas & Hulse and Robert F. Hulse, Jr., for Plaintiffs and Respondents.

## OPINION

YEGAN, J.*—On June 15, 1978, a fiery explosion occurred at USA Petroleum Corporation (hereinafter USA) which, inter alia, resulted in the death of Christopher Newman, personal injury to Harry Stallings and James Ledford, and property damage to Reagen's Vacuum Truck Service, Inc. (hereinafter Reagen Trucking). Judgment was entered on jury verdicts in a bifurcated trial. First, a jury determined that Stallings and Newman were not special employees of USA, thus subjecting USA to tort liability. Finding USA 100 percent at fault, a second jury awarded $1 million in damages to the heirs of Christopher Newman, $853,263.04 to James Ledford, $377,673.05 to Harry Stallings, and $7,997.48 to Reagen Trucking. Truck Insurance Exchange was awarded $95,191.03 for workers' compensation benefits paid to Ledford.[1]

USA appeals, contending: "I The evidence shows as a matter of law that Stallings was defendant's 'special employee' and his exclusive remedy should have been his workers' compensation benefits. II Even if special employment had been a question of fact for the jury, uncertain and unduly limited instructions on the elements of special employment denied defendant a fair hearing on that issue. III The bifurcated trial on the issue of special employment was tainted by plaintiffs' repeated references to irrelevant and prejudicial matters. IV Defendant was denied a fair trial on liability by the artificial realignment of the parties against defendant as a result of the bad faith sliding-scale settlements with other defendants. V Defendant was denied a fair trial on liability by the admission of speculative and conjectural expert opinions on purely hypothetical causes of the fire. VI Defendant was denied a fair trial on liability by the admission of irrelevant and prejudicial evidence of unrelated incidents."

(1) We view the evidence in the light most favorable to the juries' determinations as is required by the familiar rule governing appellate review. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63-64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) Allied Lyon Construction Company (hereinafter Allied) was in the business of supplying maintenance workers

---

*Assigned by the Chairperson of the Judicial Council.

[1]Other parties participated in the proceedings below, but the only parties remaining on appeal are USA, Stallings, Reagen Trucking and Truck Insurance Exchange.

for the oil industry for eight to ten oil companies in the Ventura County area. This maintenance work included assembly and disassembly of pipes, ditch digging, pouring concrete, carpentry, weed pulling, general clean-up, and assisting welders. Allied supplied the workers on an "as-needed" basis, and work for Allied was, therefore, not steady. Allied carried all of its union employees on its own payroll; provided health insurance, retirement benefits, workers' compensation; had the exclusive right to hire and terminate its employees; provided hard hats, safety glasses, gloves and some of the work tools for tasks to be performed; had the exclusive right to determine at which oil facility its employees would work on any given occasion; and had the exclusive right to determine the amount of wages to be paid to its employees. Allied workers did not wear uniforms or other insignia affirmatively identifying them as Allied employees.

By way of contrast, USA, a nonunion company, had its own work force and uniformed maintenance workers. USA had its own payroll, provided benefits to its employees, had the exclusive right to hire and terminate its own employees, provided work tools for them, conducted its own safety meetings, and provided Nomex fire-retardant clothing to its employees only. Its employees had free access to the USA physical plant and keys thereto, while Allied employees did not and had to sign in at the USA gate. In fact, the benefits were so far superior at USA that Allied had difficulty in keeping its employees from quitting to become regular employees of USA. As a result of this problem, Allied and USA entered into an agreement that no former Allied employee would be hired by USA unless he was unemployed for 30 days. Although this was a disincentive for quitting Allied to go to work for USA, it was nevertheless worth it to some employees who did so because of reliability and continuity in employment, better pay, better facilities and better insurance benefits.

Stallings and Newman were Allied's employees. Stallings had worked for Allied since 1970 and was vice president and shop steward for Oil Field Maintenance Laborers Union Local 1234. Stallings was one of the most experienced "as-needed" workers who needed no supervision whatsoever. In fact, he was responsible for the supervision of other Allied personnel who would accompany him to the subject worksites. One of his charges was Newman, who was, comparatively speaking, a novice in the oil field maintenance worker industry.

Between 1976 and 1978, USA had utilized the services of Allied's employees at the USA plant. USA had requested the services of Stallings personally, and Allied acquiesced thereto. In fact, Stallings had worked continuously at USA for the six-month period immediately prior to the fire. As indicated, Stallings was so experienced that he needed virtually no

supervision by anyone at USA. When Stallings would report to USA for work, he would be given a task by USA. USA was concerned with the result they wanted, and the manner in which the task was accomplished was left to the discretion of Stallings and other Allied employees. For example, when Ron Simmons, USA foreman on the day of the fire, was asked: "So the manner and method that they [Allied employees] used to accomplish the task that they were assigned to accomplish was up to them; isn't that correct?" he answered, "[y]es."

On the day of the fire, June 15, 1978, consistent with the aforementioned procedure of assigning tasks to be performed by Allied employees, Stallings and Newman were assigned to clean residue from a tank. They were provided with USA tools to do the assigned job. The USA foreman did not advise Stallings the manner in which it was to be performed and left it to his discretion. Stallings admitted, however, that he would have done the task in any manner directed by USA.

In connection with the "scrubbing" of natural gas at the USA plant, a by-product, "spent caustic," is produced which is disposed in some instances by way of tanker truck. The "spent caustic" contains hydrocarbons, here, pentane, which are flammable liquids and which, because they are lighter than the "spent caustic," will rise to the top of any storage tank which contains them. On June 15, 1978, an unusual amount of hydrocarbons had accumulated in storage tank T-201 (hereinafter, the tank). The 18-foot tank contained 2,646 gallons or 4.6 feet of hydrocarbons floating on top of 8.2 feet of "spent caustic." On the morning of June 15, 1978, USA decided to have Reagen Trucking vacuum the "spent caustic" from the bottom of the tank and arranged for vacuuming.

Unfortunately for everyone concerned, additional "spent caustic" was piped into the tank, raising the level of pentane in the tank, causing it to spill out through a two-inch vent pipe at the top of the tank. Prior to the spill, USA personnel checked the area with a gauge and determined that there were no flammable vapors present in the morning and even issued a welding permit for the area. No such checking occurred after the spill of pentane. The temperature in the day was in the 70's or low 80's, but tools left in the sun were too hot to touch, according to the welder who did work in the area.

During the day and as a result of thermal expansion of the liquids in the tank, further pentane escaped out the two-inch vent pipe. At approximately 3:30 p.m., Stallings noticed liquid dripping from the tank, advised the USA operator in charge, and was told that USA was aware of the problem and that a vacuum truck was on the way. At approximately 4 p.m., Ledford, a

driver for Reagen Trucking, approached the tank, left the diesel engine running, which is required to vacuum liquid into the tank of the truck, and prepared to vacuum the "spent caustic" from the bottom of the tank. No one had advised Ledford that flammable pentane was in the tank, although he knew he was working with dangerous chemicals.

Ledford put the truck's pump in the vacuum mode which would have, in essence, sucked the "spent caustic" out of the tank and into the truck after he connected the truck's hose to the tank. When Ledford opened the valve on the bottom of the tank, he was drenched with pentane liquid from the top of the tank. Stallings, who was nearby, saw an eight-foot spurt of liquid from the top of the tank, smelled gas, and started to run. Ledford unsuccessfully attempted to disengage the truck from the tank. However, it was too late. Pentane ignited from the diesel's engine, resulting in a fireball which burned Ledford and Stallings, killed Newman and did property damage to Reagen Trucking.

■ Appellant's first contention is without merit. We cannot say, as a matter of law, that the evidence shows that Stallings was the special employee of USA. In *Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 175 [151 Cal.Rptr. 671, 588 P.2d 811], our Supreme Court said, "[i]n determining whether a special employment relationship exists, the primary consideration is whether the special employer has '"[t]he right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not . . . ."' [Citation.] However, '[w]hether the right to control existed or was exercised is generally a question of fact to be resolved from the reasonable inferences to be drawn from the circumstances shown. [Citations.] And the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact.' [Citation.]"

On the very next page of the opinion, however, the Supreme Court also said, "'[t]he paramount consideration appears to be whether the alleged special employer exercises control over the details of [an employee's] work. . . .'" (*Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at p. 176.) *Kowalski* relies upon *McFarland* v. *Voorheis-Trindle Co.* (1959) 52 Cal.2d 698 [343 P.2d 923], which discusses the right to control (at p. 704) but does not declare that it is the primary consideration. To the contrary, *McFarland* declares that the "paramount consideration" is the exercise of control. (At p. 705.) We need not debate the inconsistent Supreme Court phraseology of "primary" versus "paramount" consideration or attempt to define a hierarchy of these adjectives. ■ Suffice it to say that neither right to control nor exercise of control is the exclusive consideration as is amply demonstrated by the Supreme Court's cataloguing of other factors to be

taken into consideration. (*Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at p. 177; see also *Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486, 492 [162 Cal.Rptr. 320, 606 P.2d 355].)

■ Nevertheless, appellant submits that the determinative question is *right* to control; and if it exists, special employment exists precluding tort liability. Appellant relegates *exercise* of control and consideration of other factors listed in *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at page 177, as mere "evidentiary indicia" on the issue of *right* to control. The Supreme Court has not undertaken to catalogue these criteria, whether they be referred to as factors, considerations, or evidentiary indicia, without purpose. They each have legal and factual significance and make sense if *right* to control is not the exclusive and determinative question. ■ The Supreme Court has expressly indicated in *Kowalski* that determination as to *exercise* of control is for the trier of fact and is germane on the ultimate issue of special employment vel non. (At p. 176.) Similarly, the Supreme Court has indicated that "[m]ere instruction by the borrower [here USA] on the result to be achieved will not suffice." (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 492.) This is exactly the presenting situation.

■ Even if USA had the naked right to control Stallings, such does not inexorably compel the conclusion that he was the "special employee" of USA. The jury resolved the factual question against USA, presumably on the following factors: 1. there was no actual control of Stallings; 2. Stallings was on Allied's payroll; 3. Allied had the power to determine his pay; 4. all of his benefits flowed from Allied; 5. Allied had the exclusive right to hire and terminate him; 6. Allied initially provided his hard hat, safety glasses and gloves; 7. Stallings was not an unskilled laborer and did not require supervision; 8. Stallings and other Allied employees were adamant that they did not consent to being USA employees; 9. the differences in the treatment of workers; 10. the parties, including USA, Allied, and Stallings, did not believe that they were creating a "special employment" relationship between Stallings and USA. (See *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at pp. 177-178.)

■ Appellant's second contention is also without merit. As previously indicated, given the inconsistent language in the Supreme Court opinions, we appreciate the trial court's dilemma. There is no question but that it refused to instruct the jury that the "right to control" was the "primary consideration," the "paramount consideration," or the "controlling element." Contrary to appellant's claim, we have concluded that the trial court's instruction did not deny USA a fair hearing on the question of special employment.[2]

---

[2]The jury was instructed as follows: "A person may be a general employee, a special

As indicated by the italicized portion of the instruction, the court did apprise the jury that they were to determine ". . . [w]hether this right to control existed or was exercised . . . ." We could never fault the trial court for instructing the jury with language based upon *McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d at page 705, and reiterated in *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at page 176. Consistent with the command of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], it was obligated to instruct on "actual control" and "right to control," which we believe it did. Although the instructions might have been phrased differently to provide greater assistance to the trier of fact, especially on the "other factors" listed in *Kowalski, supra,* 23 Cal.3d at pages 177-178, the jury was apprised of the determinative question, and it was for counsel to argue the factors, one way or the other.

■ We also reject appellant's third contention. USA complains that Browne Greene, counsel for Newman and associated counsel for Ledford, made reference to the death of Newman, the burning of Ledford and Stallings, and emphasized the fire-retardant capability of Nomex suits, all in violation of a court order. USA does not complain that counsel for any other party violated the court's order. The trial court denied USA's motion for mistrial based on Mr. Greene's mention thereof on the first day of the trial.

■ A motion for a mistrial is addressed to the sound discretion of the trial court. It may properly be refused where, as here, the court is satisfied that no injustice has resulted or will result from the occurrences of which complaint is made. ■ Thereafter and without objection, motion for mistrial or request for admonition to the jury, Mr. Greene continued to mention these areas.

Without citation to authority, appellant claims that he may complain of Mr. Greene's conduct even though his clients are no longer parties to this

___

employee, or both, that is dual employment. Where an employer sends an employee to do work for another, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or 'general' employer and a second, a 'special employer.' [¶] In determining whether a special employment relationship exists the primary consideration is whether the special employer controls and directs the activities of the alleged employee in the manner and method in which the work is performed. [¶] *Whether this right to control existed or was exercised is a question for you, the jury,* to determine from the facts as shown by the evidence and reasonable inferences to be drawn therefrom. [¶] In making your determination you may consider the following: [¶] 1. Consent of the worker. A worker who accepts the exercise of control and direction may impliedly consent to a special employment relationship. [¶] 2. Does direction and control go to the result to be accomplished or to the manner in which it is to be done. [¶] 3. Who pays wages and benefits. [¶] 4. Who has power to hire and discharge. [¶] 5. Who supplies work tools. [¶] 6. The skill required to accomplish the assigned duties. [¶] 7. The amount of supervision required. [¶] 8. Differences or similarities in treatment of workers. [¶] The weight, if any, to be given by you to each factor just mentioned is for you the jury to decide." (Italics added.)

appeal. While we can envision a case where an appealing defendant might be able to successfully complain about conduct of a third party plaintiff's attorney, this is not the case. Counsel for respondents on this appeal have "clean hands," and their respective clients should not suffer reversal because another plaintiff's attorney perhaps violated a court order. Confronted with first and only adverse ruling on the motion for mistrial, USA could have but did not ask for a curative admonition, which we believe would have been efficacious. (Cf. *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 392 [38 Cal.Rptr. 183].) Having failed to do so, any error is waived. (*Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 468 and fn. 4 [130 Cal.Rptr. 786].) The propriety of subsequent comments is not preserved for appellate review because appellant's attorney did not object thereto or otherwise ask for relief. "'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.] Only misconduct so prejudicial that an admonishment would be ineffective excuses the failure to request such admonishment. [Citation.]" (*Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 892 [112 Cal.Rptr. 540, 519 P.2d 588].)

■ Appellant's fourth contention is also without merit. At the commencement on the liability trial, it was brought to the trial court's attention that Reagen Trucking and Ledford had reached "conditional settlement agreements" with Stallings and the heirs of Newman. Stallings was to receive an unconditional and nonrefundable payment of $50,000 with a guaranteed total recovery of $132,500. The heirs of Newman were to receive an unconditional and nonrefundable payment of $35,000 in cash with a guaranteed total recovery of $115,000. The settlements were conditioned upon 1. the court determining that they were in good faith; 2. there being no disclosure of the existence of the settlements to the jury except for a court-determined compelling reason which might develop during the course of the trial; and 3. the court bifurcating USA's claim for damages against Reagen Trucking and Ledford for property damage to the USA facility. USA objected, and the court shortened time to one day to prepare a challenge to these "Mary Carter" settlements.

First, we cannot say as a matter of law that these "sliding scale" or "Mary Carter" settlements were not made in good faith. Although the subject settlements were entered into before our Supreme Court's decision in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] (hereinafter *Tech-Bilt*), they nevertheless meet the requirements thereof, as well as Code of Civil Procedure sections 877.5 and 877.6. ■ Considerations to be taken into account in the trial

court's determination of whether a settlement is in "good faith" vel non include: 1. whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries; 2. a rough approximation of plaintiff's total recovery and the settlor's proportionate liability; 3. the amount paid in settlement; 4. the allocation of settlement proceeds among plaintiffs; 5. a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial; 6. the financial conditions and insurance policy limits of settling defendants; 7. the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants; 8. the evaluation be made on the basis of information available at the time of the settlement. (See *Tech-Bilt, supra,* at p. 499.)

■■■ Concerning this last consideration, we quickly observe that appellant's attempt to demonstrate that the settlements were not made in "good faith" within the meaning of the foregoing authorities by comparing them with the damages fixed by the jury is simply inapposite. Mr. Greene's persuasive skills which resulted in jury verdicts for his two clients in the 1.8 million dollar range have no bearing on whether the settlements effected prior thereto were in "good faith." (*Tech-Bilt, supra,* 38 Cal.3d at p. 499.)

After extended hearing where the court considered some of the factors subsequently articulated in *Tech-Bilt, supra,* the court determined that the settlements were made in "good faith." Consistent with USA's burden of proof that the settlements were not made in "good faith" (Code Civ. Proc., § 877.6, subd. (d); see also *Tech-Bilt, supra,* at p. 499), and referring to the settlement amounts, the court said, ". . . there has been nothing presented to me by way of either evidence or affidavits or any other matter that would in any way, in my opinion, cause this Court to find the settlement is not fair and in good faith . . . ." ■■■■ Like other judicial determinations, this ruling involves the resolution of a factual issue which, consistent with time-honored rules of appellate review, must be upheld if supported by substantial evidence. (*Widson* v. *International Harvester Co.* (1984) 153 Cal.App.3d 45, 58 [200 Cal.Rptr. 136]; *Wysong & Miles Co.* v. *Western Industrial Movers* (1983) 143 Cal.App.3d 278, 290 [191 Cal.Rptr. 671]; see also *Kulko* v. *Superior Court* (1977) 19 Cal.3d 514, 519 [138 Cal.Rptr. 586, 564 P.2d 353].) ■■ "[A] determination as to whether a settlement is in good faith must be left to the discretion of the trial court." (*Tech-Bilt, supra,* 38 Cal.3d at p. 502.) "The concept of judicial discretion is difficult to define with precision. ■■ In the past [the California Supreme Court has] described it as 'the sound judgment of the court, to be exercised according to the rules of law.' . . . [T]he term judicial discretion 'implies absence of arbitrary determination, capricious disposition or whimsical thinking.' [Citation.] Moreover, discretion is abused whenever the court

exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].) ▪ Given the express and implied factual determinations, we cannot say that the trial court's decision was arbitrary, whimsical or capricious.

Contrary to appellant's subsidiary claims, we cannot say that the decision to guarantee plaintiffs a combined sum of $247,500 was a mere tactical decision to improve the case against USA rendering it not in "good faith" (see *Tech-Bilt, supra,* 38 Cal.3d at pp. 496-500 discussing, inter alia, *Cardio Systems, Inc.* v. *Superior Court* (1981) 122 Cal.App.3d 880 [176 Cal.Rptr. 254] and *Commercial U. Ins. Co.* v. *Ford Motor Co.* (9th Cir. 1981) 640 F.2d 210) or that the settlement was "'out of the ballpark.'" (*Tech-Bilt, supra,* at p. 499.) This was a Yankee Stadium settlement, not a "little league" one.

▪ Nor can we say that the trial court abused its discretion in shortening time to one day for the good faith hearing. Code of Civil Procedure section 877.6, subdivision (a), in pertinent part, provides: "Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement . . . . Upon a showing of good cause, the court may shorten the time for giving the required [20-day] notice to permit the determination of the issue to be made before the commencement of the trial of the action, or before the verdict or judgment if settlement is made after the trial has commenced." Here the order shortening time was made after counsel had announced ready for the anticipated two-month trial and during pretrial motions concerning the admissibility of evidence. Contemporaneous therewith, a different trial judge was conducting ongoing settlement discussions. While USA did initially ask for more than one day to prepare for the hearing, it expressly agreed thereto by saying: "At that time [tomorrow] I feel that I can have researched and I can be ready."

▪ Similarly, the trial court did not abuse its discretion by determining not to disclose the settlements to the jury. Code of Civil Procedure section 877.5, subdivision (a)(2), provides: "If the action is tried before a jury, and a defendant party to the agreement is a witness, the court shall, upon motion of a party, disclose to the jury the existence and content of the [sliding scale recovery] agreement or covenant, unless the court finds that such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. [¶] The jury disclosure herein required shall be no more than necessary to be sure that the jury understands (1) the essential nature of the agreement, but not including the amount paid, or any contingency, and (2) the possibility that the agreement may bias the

testimony of the alleged tortfeasor or tortfeasors who entered into the agreement."

Code of Civil Procedure section 877.5, subdivision (a)(2), tracks the latter portion of Evidence Code section 352.[3] ■ Traditionally, appellate review of such determinations is once again tested by the abuse-of-discretion standard. (See *Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 798 [121 Cal.Rptr. 200].) "Where, as here, a trial court has discretionary power to decide an issue, its decision will be reversed only if there has been a prejudicial abuse of discretion." (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142-143 [185 Cal.Rptr. 232, 649 P.2d 874]; see also 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 275-277, pp. 286-289.) ■ Here the court was expressly advised of the fact that there could be little, if any, manipulation of evidence because of the exhaustive depositions previously taken. The settling plaintiffs retained their theoretical self-interest and bias and could be impeached therewith. Based on this and the trial court's retained continuing discretion to advise the jury, we cannot say that the trial court's decision to not advise the jury of the settlements was arbitrary, whimsical or capricious. (*People* v. *Giminez, supra,* 14 Cal.3d at p. 72.) Nothing in *Moreno* v. *Sayre* (1984) 162 Cal.App.3d 116, 126-127 [208 Cal.Rptr. 444], where the trial court was faulted for not fully advising the jury after he decided disclosure was appropriate, compels a contrary conclusion.

■ Appellant's claim that it was denied a fair trial by the trial court's decision to allow experts to express their opinions to the jury as to the cause of the fire is also without merit. USA's theory of the accident was that Ledford, through his negligence, had caused the fire by forcing pressure into the tank, causing liquid pentane to escape from the top of the tank. USA introduced evidence to support its theory which could have been but obviously was not credited by the jury.

Respondent's theory of the pentane spurting from the top of the tank was through "super heating." One of their experts, John Lenoir, a chemical engineer, described the "super heating" phenomenon. A liquid surpasses its own boiling point but remains in solution without boiling until disturbed. Upon disturbance, here, the application of suction from the bottom of the tank, flash vaporization occurred causing the liquid pentane to spurt from the top of the tank. Appellant complains that the subject expert testimony was not based upon the evidence in that there was no evidence that the pentane was "super heated" to its boiling point.

---

[3]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"[A] hypothetical question to an expert must be based upon facts shown by the evidence and . . . the appellate court will place great reliance in the trial court's exercise of its discretion in passing upon a sufficiency of the facts as narrated. [Citations.]" (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 339 [145 Cal.Rptr. 47].) We cannot say, as a matter of law, that the trial court abused its discretion in expressly finding that there is sufficient evidence for the opinions. (*Id.*, at pp. 338-339.) The inference that the liquid pentane reached a "super heated" state was present from the otherwise admitted evidence the trial court had before it, e.g., that the air temperature was in the 70's or low 80's earlier in the day and that tools left in the sun were so hot that they could not be touched, which, according to USA's expert, Doctor Eldon Knuth, was 130 degrees Fahrenheit. ■ Thereafter, "[i]t is the jury, not the court, which is the factfinding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable." (*Waller* v. *Southern Pacific Co.* (1967) 66 Cal.2d 201, 206-207 [57 Cal.Rptr. 353, 424 P.2d 937].)

■ We have also determined that the court did not err in allowing evidence concerning claims of USA wrongdoing with respect to safety of workers at its plant. Plaintiffs attempted to prove that USA operated its plant with a conscious disregard for their safety, to obtain punitive damages within the meaning of Civil Code section 3294. In overruling appellant's objection, the trial court relied on *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 395, 399-401 [196 Cal.Rptr. 117], which allows the introduction of such events in an attempt to show conscious disregard. The trial court, with considerable precision, made several rulings disallowing certain evidence and allowing other incidents concerning failure to report fires and other fire-related incidents. The jury determined that USA did not operate its plant with a conscious disregard for the safety of workers on its plant. While the evidence of other incidents could have theoretically affected the liability and nonpunitive damage assessment, it was admissible on the issue of conscious disregard. USA could have but did not ask for a limiting instruction. (See BAJI No. 2.05 (7th ed. 1986).) There is no sua sponte duty to give a limiting instruction. (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701-702 [200 Cal.Rptr. 870, 677 P.2d 1147].)

Finally, we cannot say that USA's appeal is frivolous, and we therefore decline the invitation to impose sanctions. (Cf. *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 645 et seq. [183 Cal.Rptr. 508, 646 P.2d 179].)

The judgments are affirmed. Respondents, as prevailing parties, are entitled to costs on appeal.

Stone, P. J., and Gilbert, J., concurred.