[No. A044887. First Dist., Div. Three. Oct. 31, 1990.]

JUDY SANTIAGO, Individually and as Administratrix, etc., Plaintiff and Appellant, v.
FIRESTONE TIRE & RUBBER CO., Defendant and Respondent.

[No. A044887. First Dist., Div. Three. Oct. 31, 1990.]

HERBERT NEAL CLOUD, Plaintiff and Appellant, v.
FIRESTONE TIRE & RUBBER CO., Defendant and Respondent.

**COUNSEL**

Rucka, O'Boyle, Lombardo & McKenna, Alfred Lombardo, Hawes & Chu and Amanda Hawes for Plaintiffs and Appellants.

Will Glennon, Ian Herzog, Douglas Devries, Roland Wrinkle, Leonard Sachs, Robert Steinberg, Bruce Broillet and Harry R. Levine as Amici Curiae on behalf of Plaintiffs and Appellants.

McCutchen, Doyle, Brown & Enersen, John R. Reese, William H. Armstrong, Jane E. Lovell and Nina K. Srejovic for Defendant and Respondent.

Fred J. Hiestand as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

**WHITE, P. J.**—Plaintiffs Herbert Neal Cloud (Cloud) and Judy Santiago, individually and as administratrix of the estate of Jose Santiago (collectively appellants),[1] appeal from a judgment entered for defendant Firestone Tire & Rubber Company (respondent or Firestone) on a second special verdict finding that respondent did not know that Cloud and Santiago had suffered bone marrow injury caused by their employment. Appellants contend that the court erred in failing to declare a mistrial after the jury deadlocked on the first special verdict question, and that the court erred in its instructions on the nature of the injury the jury was required to find (bone marrow injury); the standard of proof for fraudulent concealment under Labor Code section 3602, subdivision (b)(2); and the employer's duty to disclose work-related injury. We find no error and affirm the judgment.

*Procedural Background*

Santiago and Judy Santiago filed a complaint on January 30, 1985, for compensatory and exemplary damages for personal injury and loss of consortium. The complaint alleged that while Santiago was employed at respondent's Salinas plant, he was exposed to benzene and benzene-containing chemical formulations, which exposure caused him to develop leukemia and other illnesses.[2]

Cloud filed a complaint on March 20, 1987, which contained allegations similar to those in the Santiago complaint and named as defendants, in addition to Firestone, Union Oil Co. of California (Union Oil), Chevron U.S.A. (Chevron), and Shell Oil Co. (Shell).[3]

The Santiago and Cloud cases were coordinated with three other similar cases. (Cal. Rules of Court, rule 1550(b).) On the motion of the various plaintiffs below, the cases were consolidated for trial. Respondent states, and appellants do not dispute, that one case settled before trial; a coordinated trial on the four remaining cases was held from January to March 1988,

---

[1] For convenience, Jose Santiago will be referred to as Santiago.

[2] The complaint named as Does the manufacturers, wholesalers, retailers, and distributors of the chemicals, as well as the installer and designer of the ventilation system at the plant.

[3] Cloud settled with Shell and with Chevron in good faith before trial.

and resulted in a hung jury; two of the remaining cases settled during the second trial, which began in October 1988.

On December 7, 1988, the jury returned its special verdicts, and on January 18, 1989, the court filed its judgments in favor of respondent on the special verdicts. This timely appeal followed.

### The Verdicts

Special verdict question number one was: "Prior to the time [Santiago] contracted chronic myelogenous [or Cloud contracted acute lymphocytic] leukemia, did he suffer a bone marrow injury that was caused by his employment at the Salinas Firestone plant?" The jury deadlocked seven to five on this question as to both Santiago and Cloud. Appellants moved for a mistrial and objected to the jury's considering any further questions. The court denied the motion.

Special verdict question number two was: "Prior to the time [Santiago or Cloud] contracted . . . leukemia, did Firestone know that [he] had suffered a bone marrow injury and that it was caused by his employment at the Salinas Firestone plant?" The jury answered "no," voting 10 to 2 as to both Santiago and Cloud.

### The Statute and the Issues

Labor Code section 3602 provides that workers' compensation is the sole and exclusive remedy for injured workers except under specified circumstances. Subdivision (b) of that section provides in relevant part: "(b) An employee, or his or her dependents in the event of his or her death, may bring an action at law for damages against the employer, as if this division did not apply, in the following instances: . . . [¶] (2) Where the employee's injury is aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with the employment, in which case the employer's liability shall be limited to those damages proximately caused by the aggravation. The burden of proof respecting apportionment of damages between the injury and any subsequent aggravation thereof is upon the employer . . . ."

Appellants claim that in this action under Labor Code section 3602, subdivision (b)(2), for an injury "aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with the employment," the court improperly usurped the role of the jury by requiring a finding of a specific injury, namely "bone marrow injury."

Appellants contend that the court erred in holding them to a higher standard of proof (actual knowledge) than is required in ordinary fraud cases.

Appellants argue that the court should have instructed the jury on the employer's duty to disclose the existence of any and all work-related injuries, and that the court, having instructed the jury to proceed to each successive question on the special verdict form only if and when nine or more jurors reached agreement on the preceding question, should have declared a mistrial when the jury deadlocked on the first question.

*Factual Background*

Although we take the facts from the record before us and not from other appellate decisions, the following excerpt from a United States Supreme Court opinion of 10 years ago provides informative background about benzene in the workplace. (*Industrial Union Dept.* v. *American Petrol. Inst.* (1980) 448 U.S. 607 [65 L.Ed.2d 1010, 100 S.Ct. 2844] (opn. by Stevens, J.).)

"Benzene is a familiar and important commodity. It is a colorless, aromatic liquid that evaporates rapidly under ordinary atmospheric conditions . . . . [It is] produced by the petroleum and petrochemical industries, [and] by the steel industry as a byproduct of coking operations. Benzene is used in manufacturing a variety of products including motor fuels (which may contain as much as 2% benzene), solvents, detergents, pesticides, and other organic chemicals. [Citation.]

"The entire population of the United States is exposed to small quantities of benzene, ranging from a few parts per billion to 0.5 ppm [parts per million], in the ambient air. [Citation.] Over one million workers are subject to additional low-level exposures as a consequence of their employment. The majority of these employees work in gasoline service stations, benzene production . . . , chemical processing, benzene transportation, rubber manufacturing, and laboratory operations.

"Benzene is a toxic substance. Although it could conceivably cause harm to a person who swallowed or touched it, the principal risk of harm comes from inhalation of benzene vapors. When these vapors are inhaled, the benzene diffuses through the lungs and is quickly absorbed into the blood. Exposure to high concentrations produces an almost immediate effect on the central nervous system. Inhalation of concentrations of 20,000 ppm can be fatal within minutes; exposures in the range of 250 to 500 ppm can cause vertigo, nausea, and other symptoms of mild poisoning. [Citation.]

Persistent exposures at levels above 25-40 ppm may lead to blood deficiencies and diseases of the blood-forming organs, including aplastic anemia, which is generally fatal.

"Industrial health experts have long been aware that exposure to benzene may lead to various types of nonmalignant diseases . . . . [¶] As early as 1928, some health experts theorized that there might also be a connection between benzene in the workplace and leukemia . . . . [¶] Between 1974 and 1976 additional studies were published which tended to confirm the view that benzene can cause leukemia, at least when exposure levels are high." (*Industrial Union Dept.* v. *American Petrol. Inst., supra*, 448 U.S. at pp. 615-619, fns. omitted [65 L.Ed.2d at pp. 1018-1021].)

*The Facts*

In summarizing the facts presented by this lengthy record, we are guided by the principles that where the facts are in conflict, we are bound to uphold the findings of the trier of fact, for our primary function is to review errors of law, not to assume the burden of determining the facts, a task for which the trial court is uniquely qualified. (See generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 278-280, pp. 289-292.) Accordingly, hereafter we emphasize the facts in the record upon which respondent relies in meeting appellants' contentions.

It is undisputed that Santiago worked as a tire builder at respondent's Salinas plant, and that the process of tire building involved the use of rubber solvent to render the components of the tire sticky as it was being assembled. Solvent was kept in what the workers had come to call a "bennie can," and was applied to the tire by the worker, who used swabs of rags held in a metal clip. There was testimony that because tire builders were paid by the piece, they worked quite fast, and often splashed solvent on their clothing, hands, and faces.

It is likewise undisputed that in 1966 Cloud was hired by respondent to work as a service and utility person in the "bead room," where solvent was also used. His primary job was to bring supplies and materials to the people working as bead builders, that is, those who fabricated the component of tires known as "beads," the function of which is to help hold the tire to the metal rim of the wheel. Cloud explained that beads were built by wrapping fabric around a wire and using solvent to make the fabric stick together. One of his jobs was to keep the bead builders supplied with "bennie" by refilling their "bennie cans" from tanks in the tire room. Later, in about 1972, the method of bead building changed, and the beads were dipped into

tanks of a compound to which "bennie" was added as a thinner. Cloud also delivered beads to the tire room as needed.

Cloud also performed jobs other than service and utility. For example, he testified that he was a wire winder for a couple years, and he did a variety of overtime work, mostly in the bead room but also in places like the warehouse or in final inspection.

Appellants place great emphasis on evidence tending to show industry's and respondent's longstanding knowledge of the adverse health effects of benzene. Respondent does not deny that it was aware of the presence of benzene in its Salinas plant or that it has known of the hazards of exposure to benzene for a long time. However, Robert Jazwin, respondent's chief chemist at the Salinas plant from 1974 until it closed in 1980, testified that benzene was used only in the laboratory and that it was not used in the production department. Jazwin explained that a bottle of benzene was kept in the laboratory to be used as a standard against which air samples from the work areas of the factory were compared. He did not think there would have been any particular advantage in using benzene in the production of tires. He believed that other solvents used in the plant were better for that purpose. He gave as an example the solvent with Firestone's code No. 374.

According to D. Michael Kane, head of Firestone's department of industrial relations from 1973 until 1980, the solvents used at the Salinas plant did not contain benzene except where it was present as a contaminant.

William Ellis, retired senior research associate for Chevron Research Company (Chevron Research), was familiar with the products sold by Chevron Research to Firestone, because he had developed them at Chevron Research for Firestone. He testified to the composition of the solvents sold by Chevron Research to Firestone. The solvents were known by numbered codes for convenience. Firestone's code No. 356 consisted of Chevron Research thinner No. 183, which was a blend of Chevron Research's thinner No. 200 and a small amount of hexane. The supplier of the hexane to Chevron Research guaranteed that it contained no more than 0.1 percent benzene. Firestone code No. 374 was Chevron Research solvent No. 54-L. Chevron routinely tested all solvents for benzene and many other properties.

Over the period of years from 1971 to 1978, the volume percent of benzene in code No. 356 ranged from 0.0 percent in 1974 and 1975, to 0.7 percent in 1976, falling to 0.2 percent in 1977 and 1978. Code No. 374 contained 0.0 percent in 1974 and 1975, 0.1 percent in 1971, 1976, and 1978, and 0.2 percent in 1977.

Michael Williams, a compliance industrial hygienist for the California Occupational Safety and Health Administration (Cal OSHA) from 1977 to 1981, testified that an investigation by Cal OSHA of respondent's Salinas plant on May 14, 1979, confirmed that benzene was not used as a "primary constituent" outside the laboratory. The average concentration of benzene in the work materials at the plant was less than one or one and one-half percent. The highest concentration of benzene in the air to which any witness testified was measured in July 1975, at just below 3 ppm, as compared to the 10 ppm allowable under pre-1988 OSHA standards.

There is some confusion in the record among the various witnesses, and therefore between the parties at bench, about how much, if any, benzene was used in the Salinas plant. For example, appellants state that "Code 302 was 100% benzene," and that a 55-gallon drum of code No. 302 was kept on hand for "off the books" use. However, Charles Menees, who worked at the plant from 1963 to 1980, and who testified to these facts, also testified that all solvents had the nickname, "bennie," because in old times the tire builders had used only benzene as a solvent and had therefore given solvent this name. Menees stated that although the name on the drum of the "industrial benzene" was spelled "benzinne" or "benzinnee," his supervisor said it was "industrial benzene."

Chief Chemist Jazwin explained that drums of Firestone No. 304, which contained naphtha, a very different substance from benzene, had formerly been labelled "benzine," which was pronounced "benzene." It is obvious that this labeling and pronunciation is a source of possible confusion about the presence of benzene in the plant or the amount of benzene present in the plant.

Appellants emphasize evidence that respondent knew appellants were exposed to benzene, and appellants argue that respondent therefore knew appellants had suffered benzene-related preleukemia injury. There was evidence presented by Doctors Teitelbaum and Wallerstein, however, which showed that at the times relevant here, that is, before 1980,[4] it was believed that the low concentrations of benzene at the Salinas plant did not pose a health risk. According to Dr. Allan Smith, a professor of occupational health epidemiology at the University of California at Berkeley, studies conducted before 1980 found little or no evidence linking benzene to leukemia. And, in *Industrial Union*, the United States Supreme Court cited then-current evidence that there was "no excess risk of leukemia among workers exposed at levels below 10 ppm . . . ." (*Industrial Union Dept.* v. *American Petrol. Inst., supra*, 448 U.S. at p. 634 [65 L.Ed.2d at p. 1030].)

---

[4] Cloud quit working for Firestone in 1976; Santiago worked for Firestone from 1974-1980; the Salinas plant closed in June 1980.

By the time of this trial there had been several studies which indicated that benzene levels as low as one ppm would cause some excess leukemia, ranging from three to fourteen per thousand. But even one of appellants' experts was only able to say that it was "probable" that Santiago's and Cloud's leukemias were caused by benzene exposure in the workplace. Another of appellants' experts, toxicologist Daniel Teitelbaum, M.D., testified that the state of knowledge about a link between benzene and leukemia prior to 1980 and 1983 was "prehistoric." Even as late as 1983, Dr. Teitelbaum did not know of a single reported case in medical literature of toxicity due to long-term (10- 20-year) benzene exposure under 25 ppm.

Appellants contend that under the facts of this case Firestone should have conducted a medical monitoring program, including blood tests, which they argue would have shown the severity of adverse health effects from which Santiago and Cloud were suffering. However, Robert Hofer, senior industrial hygienist for Firestone, believed that it would have been "unfair to the employees that have very low exposures to have them stuck with a needle on a periodic basis if there was no call." Hofer explained that Firestone was following the lower of two guidelines set by the United States Occupational Safety and Health Administration (US OSHA) and the American Conference of Governmental Industrial Hygienists (ACGIH). The latter is a group that annually reviews all current information on hazardous chemicals and changes exposure limits accordingly.

After Dwight Stout (a plaintiff below) was diagnosed with leukemia in 1979, blood tests on his coworkers were performed and proved to be "within the normal range." Santiago's blood tested normal in 1977, and tests at various times before he was diagnosed with leukemia did not indicate he would be developing leukemia. As late as 1986, Cloud's tests showed normal bone marrow.

Appellants cite various symptoms—nausea, dry skin, headaches—suffered by Santiago and Cloud which appellants claim indicate benzene exposure and probability of developing leukemia. But Santiago testified that he thought his one or two episodes of nausea were caused by hangovers; and although Cloud testified to headaches, there was expert testimony that there are "many causes for headaches" such as noise and other solvents not containing benzene.

Santiago suffered a skin rash sometime between 1974 and 1977, but his dermatologist testified that Santiago had an hereditary skin condition known as atopic dermatitis, common in allergic families. The doctor did not believe that the condition was contact dermatitis caused by skin contact with solvents.

Hematologist Ralph Wallerstein, M.D., testified that the chronic myelogenous leukemia Santiago developed in 1984 could not have been caused by the benzene exposure shown by the evidence, namely, to one to three ppm benzene in the workplace over a five- or six-year period. Dr. Wallerstein gave two reasons for this opinion. First, "the amount of exposure is much too small to be seriously concerned with any effects on the [bone] marrow, let alone leukemia, and secondly chronic myelocytic leukemia is not the sort of leukemia that's associated with this kind of damage process, [from] benzene, for instance." Benzene exposure results in acute, not chronic, myelogenous[5] leukemia, the doctor explained. The chronic disease is complex and is not associated with benzene.

Cloud developed acute lymphatic leukemia about a year after his last (1986) blood test. Dr. Wallerstein testified that there was nothing in that blood test to indicate Cloud was going to develop the disease, nor did the doctor believe there was a connection between benzene exposure and acute lymphatic leukemia, which is clinically similar to myelocytic leukemia. Again, he gave as reasons that the level of benzene exposure under consideration was not "substantial," and that lymphatic leukemia "is not a bone marrow disease primarily. Historically it's unlikely to be due to benzene. Historically that is just what's happened. There have been no benzene-associated acute lymphatic leukemias."

Dr. Wallerstein testified that the cause of the vast majority of leukemias, that is 95 percent or more of all cases, including Santiago's and Cloud's, is unknown.

Dr. Allan Smith, the Berkeley professor of occupational health epidemiology mentioned above, testified somewhat differently. He believed that it was "probable" that Santiago's and Cloud's leukemias were caused by exposures in the workplace at the Salinas plant and that benzene "played a role in the cause." He believed that "myeloid" leukemias such as found in these cases could be the result of benzene exposure through benzene's effect on the bone marrow. He cited studies which "suggest" that chronic myelogenous leukemia was "related" to benzene. In any event, when benzene operates as a factor in leukemia, it does so through toxicity to the hematopoietic system, the part of the body which forms blood cells, of which the bone marrow is the key part.

Dr. Smith was of the opinion that if Santiago's and Cloud's leukemias were caused by benzene exposure, they would necessarily have suffered

---

[5] Dr. Wallerstein used the terms "myeloblastic," "myelocytic," and "myelogenous" interchangeably and testified that he considered them synonymous.

injury to their bone marrow while employed at the plant and exposed to benzene. They would not, however, have had symptoms, and no "suffering" would be involved in this process. Dr. Smith testified that blood tests that showed some lowering of blood count might suggest some damage to the bone marrow. Dr. Wallerstein testified that blood tests could raise a possibility of bone marrow damage but cannot establish it.

*Discussion*

*Requirement of Finding Bone Marrow Injury*

■ In order to succeed in their attempt to remove their case from the workers' compensation law, appellants first had to show an "injury." They then had to prove that the injury was aggravated by Firestone's fraudulent concealment of the existence of the injury and its connection with the employment. (Lab. Code, § 3602, subd. (b)(2).) In its instructions to the jury and in the special verdict forms, the court repeatedly referred to that initial injury as the "bone marrow injury." For example, the court told the jury that for Cloud to prove his case he had to show, "One, that prior to contracting acute lymphocytic leukemia, he suffered a bone marrow injury caused by his employment at the Firestone plant. [¶] Two, that Firestone had actual knowledge that Mr. Cloud had suffered a bone marrow injury, and that the bone marrow injury had been caused by Mr. Cloud's employment . . . ." The court gave similar instructions about Santiago's case. The special verdict forms similarly referred to the injury as a bone marrow injury.

When instructions were being discussed in chambers, appellants objected to these uses of the phrase, "bone marrow injury," stating that it was "too restrictive" because there were "various aspects" to the initial injury, and that bone marrow injury was only one way that the testimony had described it. Counsel cited "injuries to the blood-forming system" and "depression of blood-forming elements" as examples. The court overruled the objection, giving several reasons. First, the testimony was that bone marrow is the blood-forming system. Second, the phrase, "bone marrow injury," would make clear to the jury that they are restricted to finding this particular type of injury and cannot use any other injury upon which to base recovery for appellants. The court stated that the phrase would be used but that counsel could elaborate during their argument to make clear that it is a shorthand phrase to cover all types of damage to the blood-forming elements.

Appellants cite this ruling as error. They suggest that the court usurped the province of the jury and imposed a higher burden of proof on them than was required by law. We do not agree.

Throughout the trial all parties focused on the alleged injury to the blood-forming system, that is, the bone marrow, so that even in the midst of its objection to the instructions, appellant's counsel, Mr. Lombardo, referred to "bone marrow injury" as "a good, shorthand phrase to use . . . ." In describing his opening statement, Mr. Lombardo said that he had referred to injuries to the "blood system, an injury that was known to Firestone, and an injury which, as a result of the concealment by Firestone, was then aggravated into leukemia." The testimony of appellants' expert, Dr. Smith, was unequivocal that if Santiago's and Cloud's leukemia was caused by benzene exposure, there would have been a precursor injury to the bone marrow.

Appellants argue that the jury should have been instructed on other terms used during trial to describe the injuries Santiago and Cloud suffered, such as "benzene poisoning," but they point to no evidence showing that these other terms, like bone marrow injury, described an injury which was believed by at least some experts to be a precursor injury to leukemia. Appellants rely on *Foster* v. *Xerox Corp.* (1985) 40 Cal.3d 306 [219 Cal.Rptr. 485, 707 P.2d 858] (hereafter *Foster*), where both the initial precursor injury and the ultimate aggravated injury were the same. The worker alleged that he suffered "arsenic poisoning," and that this injury was aggravated over time due to fraudulent concealment by the employer. (*Id.*, at p. 309.) *Foster* is inapposite here because alleged initial symptoms such as "benzene poisoning" were not shown to be precursor injuries to leukemia.

Appellants claim that the court imposed an unduly high burden of proof regarding the precursor injury. As we have stated, the evidence showed that bone marrow injury would necessarily have been a precursor injury to leukemia induced by benzene exposure in the work place. The court did not err in instructing the jury that the burden was on appellants to prove that initial injury.

### Actual Knowledge

The court instructed the jury that appellants had the burden of proving "that Firestone had actual knowledge that [Santiago and Cloud] suffered a bone marrow injury, and that the bone marrow injury had been caused by [Santiago's and Cloud's] employment at the plant." Appellants maintain that the court imposed too great a burden on them when it required proof of "actual knowledge," and that the principles applicable to an ordinary fraud action, such as constructive knowledge, should have been applied here.[6] We

---

[6] The California Trial Lawyers Association has filed an amicus curiae brief in support of this point; discussion of its arguments is integrated with those of appellants. (See *Johns-Man-*

do not agree with appellants, but rather find that the history of Labor Code section 3602, the language of the statute, and the cases construing it show that their position is not well taken.

The seminal case which led to the enactment of Labor Code section 3602 is *Johns-Manville Products Corp.* v. *Superior Court, supra,* 27 Cal.3d 465 (hereafter *Johns-Manville*). At the outset the Supreme Court defined the issue before it in this way: "whether an employee is barred by [the workers' compensation laws] from prosecuting an action at law against his [or her] employer for the intentional torts of fraud and conspiracy in *knowingly* ordering the employee to work in an unsafe environment, *concealing* the risk from him [or her], and, after the employee had contracted an industrial disease, *deliberately* failing to notify the state, the employee, or doctors retained to treat him [or her], of the disease and its connection with the employment, thereby aggravating the consequences of the disease." (*Id.*, at p. 468, italics added.) The court held that the workers' compensation law bars an action at law for the initial injury but that a cause of action may exist for aggravation of it due to fraudulent concealment. (*Id.*, at p. 469.)

*Johns-Manville* dealt with injury caused by long-term exposure to asbestos. The complaint alleged that the corporation had known since 1924 that such exposure was dangerous to workers' health and that it concealed the knowledge from plaintiff worker, advising him that the workplace was safe. The complaint alleged that the corporation hired unqualified doctors to examine plaintiff and did not provide them with adequate information about the risks of asbestos exposure, even though it *knew* that this was the cause of his illness. (*Johns-Manville, supra,* 27 Cal.3d at p. 469.)

The Supreme Court reviewed the history of Labor Code section 4553, which provides for a 50 percent increase of workers' compensation benefits where the employee's injury is the result of "serious and willful misconduct" of the employer. (Lab. Code, § 4553, subd. (a).) The court concluded that the section is intended to penalize "intentional misconduct of an employer." (*Johns-Manville, supra,* 27 Cal.3d at p. 473.) However, the court observed that in some cases of intentional misconduct an action at law had been allowed. The court's review of the cases showed that compensation was determined to be the exclusive remedy in cases where the employer concealed dangers inherent in material that employees were required to handle or made false representations in that regard, or where the employer was guilty of malicious misconduct in allowing an employee to use a machine without proper instruction. (*Id.*, at pp. 473-474.) The court opined

*ville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 470-471, fn. 4 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758].)

that to allow actions at law in such cases would undermine the underlying premise of the workers' compensation system. The court therefore rejected the worker's claim that "any misconduct of an employer which may be characterized as intentional warrants an action at law for damages." (*Id.*, at p. 474.)

But the court went on to analyze cases which had permitted an action at law, and although they did not fall into "a tidy and consistent rationale," they showed a trend toward allowing the action at law "for injuries suffered in the employment if the employer acts deliberately for the purpose of injuring the employee or if the harm resulting from the intentional misconduct consists of aggravation of an initial work-related injury." (*Johns-Manville, supra*, 27 Cal.3d at p. 476.) The court held that the case before it came within this exception to the general rule because of the fraudulent concealment allegation discussed above. (*Id.*, at p. 477.) The court concluded that permitting the action at law in such cases would not undermine the policy of workers' compensation, because "we cannot believe that many employers will aggravate the effects of an industrial injury by not only *deliberately concealing* its existence but also its connection with the employment." (*Id.*, at p. 478, italics added.)

The Legislature codified the *Johns-Manville* holding two years later, describing the subject misconduct on the part of an employer by using the terminology, "fraudulent concealment." (Stats. 1982, ch. 922, § 6, p. 3367.) In *Foster, supra*, 40 Cal.3d 306, the court addressed the issue whether the statutory term "fraudulent concealment" required "affirmative misrepresentations by the employer regarding the existence of the injury and its connection with the employment, or whether the employer may be held liable in an action at law if he [or she] *merely knew* of these matters but failed to reveal them . . . ." (*Id.*, at pp. 308-309, italics added.)

The court held that affirmative misrepresentations were not required. Emphasizing the importance of knowledge, the court observed that the meaning of "fraudulent concealment" is not difficult to discern. "According to both statute and case law, the failure to disclose facts may constitute fraud if the party *with knowledge* has a duty to make disclosure. [Citations.]" (*Foster, supra*, 40 Cal.3d at pp. 309-310, italics added.) The court reviewed its *Johns-Manville* decision and found nothing there to support the employer's claim that affirmative misrepresentation should be required. (*Foster, supra*, at pp. 310-311.)

The court then addressed the employer's claim that the complaint was defective because it failed to allege that the employer knew of the employee's having contracted arsenic poisoning. The Supreme Court held, "Such

*knowledge is essential* to establish a claim under subdivision (b)(2) because defendant obviously could not be charged with concealing matters which it did not know. [Citation.]." (*Foster, supra,* 40 Cal.3d at p. 312, italics added.) The allegations that plaintiff had advised his supervisor of certain symptoms and that the employer knew those symptoms were of arsenic poisoning were not sufficient to constitute an allegation that the employer knew of plaintiff's disease. (*Ibid.*) Nevertheless, the court concluded that demurrers were improperly sustained, the complaint being sufficient because it alleged "that defendant knew plaintiff had contracted arsenic poisoning from his employment and concealed that knowledge from him, thereby aggravating his illness . . . ." (*Ibid.*)

■ This holding by the Supreme Court compels us to reject appellants' claim that the trial court erred when it instructed the jury that appellants were required to show "actual knowledge" on the part of respondent. Appellants argue that the requirement of actual knowledge rewarded respondent for its failure to initiate medical monitoring, thereby permitting it to escape liability because by failing to provide tests it could claim it "actually" did not know of Santiago's and Cloud's injuries. Appellants similarly suggest that the court should have instructed the jury on constructive knowledge, imputed knowledge, and reckless misrepresentation, but they cite no persuasive decisional authority in a case brought under Labor Code section 3602.

We are not unsympathetic to appellants' arguments, but they should be addressed to the Legislature, which enacted Labor Code section 3602, or to the Supreme Court, which interpreted it in the cases discussed above, and which court, in *Johns-Manville,* rejected as unrealistic the concern that many employers would deliberately conceal an industrial injury. (*Johns-Manville, supra,* 27 Cal.3d at p. 478; see *McDonald* v. *Superior Court* (1986) 180 Cal.App.3d 297, 303 [225 Cal.Rptr. 394] ["knowledge of an existing work-related injury is essential"]; see also *Stalnaker* v. *Boeing Co.* (1986) 186 Cal.App.3d 1291, 1300-1301 [231 Cal.Rptr. 323] [plaintiff's proposed exception to workers' compensation exclusivity for " 'substantial certainty' of harm from an employer's misconduct" rejected "as not only unsanctioned in law and insufficiently warranted by this case, but as standardless and unlimited"].)

*Duty to Disclose*

■ Appellants cite as error the trial court's refusal to give their proposed instruction No. 19, which read: "An employer has a duty to its employees to disclose to them the existence of any work-related injury, illness or condition known to the employer." The court gave as its reasons

for refusing the instruction, ". . . there are a number of injuries and illnesses that are involved in this case that may or may not be relevant to the particular theory of liability. The instruction in BAJI 15.13 [which in essence was given] presumes a duty by holding someone liable for not making a disclosure of a particular injury that is aggravated."

The trial court was correct on both counts. First, as we said above, the only relevant precursor injury was the bone marrow injury because the experts agreed it would be the precursor injury later aggravated into leukemia. Second, it is axiomatic that a proposed instruction need not be given if it is covered by another instruction. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial § 241, pp. 247-248.) The court instructed the jury in accordance with BAJI No. 15.13 that liability would attach if appellants proved, inter alia, that respondent fraudulently concealed the bone marrow injury, and the court fully instructed the jury on the elements of fraudulent concealment. Therefore, appellants' proposed instruction was both overbroad and superfluous. In any event, as suggested by respondent, any arguable error was harmless in light of the jury's finding that respondent did not know of the bone marrow injury or its cause.

### Special Verdicts

Appellants claim that the court erred when it denied appellants' motion for a mistrial and instructed the jury to proceed with special verdict question No. 2 after the jury was unable to reach a verdict on question No. 1. The decision to grant or deny a mistrial is within the discretion of the trial court, which may properly deny the motion if it is satisfied that no injustice will result from the occurrences about which the moving party complains. (*Barajas* v. *USA Petroleum Corp.* (1986) 184 Cal.App.3d 974, 985 [229 Cal.Rptr. 513].)

Here, the question upon which the jury was unable to agree was whether, prior to Santiago's and Cloud's contracting leukemia, they suffered a bone marrow injury caused by employment at the Salinas plant. Had the court declared a mistrial at this point, a lengthy and costly retrial might have followed. Instead the court, in its discretion, permitted the jury to answer the second question, by which the jury found that before Santiago and Cloud contracted leukemia, respondent did not know they had suffered the (presumed) bone marrow injury and that it was caused by employment at the plant. This answer disposed of the case. Without an affirmative answer, no recovery under Labor Code section 3602 was possible.

### Conclusion

It has long been recognized that workers exposed over a period of time to certain levels of benzene may suffer bone marrow injury which

ultimately can aggravate into leukemia. That may be what happened to Santiago and Cloud. However, if that is true, those facts alone do not entitle them or their heirs to recover outside the workers' compensation law under *Labor Code section 3602*. The Legislature has determined that more facts must be shown; in particular, appellants must show that their employer acted with knowledge. Here the jury was not convinced of this critical fact. The jury's verdict was not the result of any error on the part of the trial court, but ultimately came down to a failure of proof.

The judgments are affirmed.

Merrill, J., and Strankman, J., concurred.

The petition of appellant Santiago for review by the Supreme Court was denied January 17, 1991. Mosk, J., was of the opinion that the petition should be granted.