[No. B002960. Second Dist., Div. Two. Nov. 28, 1984.]

DOMINGO MORENO, Plaintiff and Respondent, v.
WAYNE SAYRE, Defendant and Appellant.

**COUNSEL**

Ives, Kirwan & Dibble, Martin J. Kirwan and Jerry E. McLinn for Defendant and Appellant.

Ramsey & McNulty and Jerry A. Ramsey for Plaintiff and Respondent.

**OPINION**

**COMPTON, Acting P. J.**—Plaintiff Domingo Moreno instituted this action seeking recovery of damages for personal injuries sustained by him while operating a punch press, the control system of which was manufactured and designed by defendant Wayne Sayre (Sayre), doing business as Automation Installation and Design (Automation). Joined as defendants were Automation, D'Arcy Company (D'Arcy) and C & K Machine Tool (C & K). The latter two were alleged to be distributors of Automation's product. Plaintiff alleged negligence, strict product liability and breach of warranty. D'Arcy and C & K cross-complained against Automation seeking indemnification.

The jury returned a verdict finding all defendants liable to plaintiff but finding in favor of Automation on the cross-complaints for indemnification. Significantly, the jury further found that Natter Manufacturing Company (Natter), plaintiff's employer, was 55 percent responsible for plaintiff's injury and the defendants, collectively, were 45 percent responsible. Plaintiff's damages were fixed at $400,000.[1] We reverse.

---

[1]Prior to trial defendants D'Arcy and C & K entered into a sliding scale agreement which guaranteed plaintiff $200,000 should the jury return a defense verdict. In the event that plaintiff recovered in excess of that amount from Automation, however, the two settling defendants were to be absolved from paying any portion of the damages awarded by the jury. Defendant Automation was therefore liable to plaintiff for the full amount of the award less $52,000 plaintiff had received in worker's compensation benefits. (See discussion, *infra.*)

■ Although Automation's attack upon the verdict is couched in a variety of terms, it primarily contends that the evidence is insufficient to support the judgment and that the trial court improperly instructed the jury on the applicable law.

■ Our review of the evidence is governed, of course, by the familiar rule that all conflicts must be resolved in favor of the prevailing party and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. The power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or not, which will support the conclusion reached by the trier of fact. ■ It is the province of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses. The jury therefore may accept part of the testimony of a witness and reject another part. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059], *Gray* v. *Southern Pacific Co.* (1944) 23 Cal.2d 632, 641 [145 P.2d 561].) ■ When two or more inferences can be reasonably drawn from the facts, the reviewing court is without power to substitute its deductions for those of the jury. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; *Metzger* v. *Barnes* (1977) 74 Cal.App.3d 6, 9 [141 Cal.Rptr. 257].)

Bearing in mind these well-established principles, we begin our review by setting forth the evidence adduced at trial in the light most favorable to the judgment.

At the time of his injury, plaintiff had been employed by Natter for slightly more than one year. As part of his job, he operated a Cleveland 400-ton punch press, used for the fabrication of metal parts. It was during his operation of this machine that plaintiff sustained the injury that gave rise to the instant litigation.

The press, approximately 25 feet in height and weighing several tons, was over 21 years old at the time of plaintiff's injury. To comply with new safety regulations, Natter upgraded the equipment in late 1973 and early 1974. In so doing, the company contracted with C & K to install a new air clutch and air brake to replace the older system. C & K subsequently contracted with its supplier, D'Arcy, to provide and install the new clutch and brake systems. To make the press operable with this new equipment it became necessary to install certain electronic controls and safety devices. D'Arcy therefore acquired an electronic Universal Safety Control System, designed, produced and eventually installed by Automation.

As the owner of Automation, Sayre met with representatives of Natter to discuss the type of control system that would meet the company's needs. The controls subsequently installed by Sayre consisted of dual palm buttons used by the operator to initiate a particular operating cycle, and the associated electrical circuitry required to permit certain alternative operational modes. The system also incorporated a number of safety features. Sayre was specifically directed to design a system which would prevent the press from operating continuously. A switch box was thus incorporated into the design, allowing for the selection of a particular operating mode by the use of a key. The "single stroke" mode triggered the machine to complete one cycle for each press of the double palm buttons. Although the switch contained a "continuous mode" selector, if activated the press would operate in an "inch mode" instead of functioning continuously. As designed, however, if the key was set between the "single" and "continuous" modes the punch press would operate continuously without either palm button being depressed. To insure the safety of the system, the key was under management, not operator, control.

Upon completing the work, the control system was checked by both Sayre and a Natter employee and found to be satisfactory. Sometime later, the control system was modified to include a Gordon brake monitor and an event counter, both of which were wired directly into the electrical terminals installed by Automation.

Plaintiff's injury occurred some 42 months after Automation's controls had been installed. During that 42-month period, the machine performed without incident.

On the morning of the accident, plaintiff began operating the press without manipulating any of the control switches. The machine had been prepared for use by the "set-up" man and the key to the switch was under the control of the foreman. During the course of his work, plaintiff noticed that the press "danced" or "chattered" in a start-stop motion while the control switch was operating in the "single stroke" mode. After reporting the problem to the foreman, the die was tightened and plaintiff was instructed to continue working. He resumed loading pieces of metal into the press using both hands. Plaintiff then activated the machine by depressing the dual palm buttons. When the press had completed its stroke cycle with the ram in its uppermost stopped position, he reached into the chamber with his right hand to remove several pieces of scrap metal. Suddenly and unexpectedly, the press began to operate and the ram rapidly dropped, severing plaintiff's right thumb and crushing most of his right hand and wrist. The press continued to run until disconnected from its electric power source. When restarted the machine operated normally.

The testimony of the expert witnesses in attempting to explain the occurrence was something less than impressive. All of them spoke in terms of "possibilities," each selecting his own "preferred possibility."

Plaintiff's experts proffered a theory of an errant or phantom piece of wire jamming a critical part of one of the switches in the control system. Automation countered with a theory that the malfunction resulted from a chafed wire at a cable connection installed by someone other than Sayre. It was further theorized that a phantom piece of metal had caused either the clutch or brake, originally installed by C & K, to malfunction at the time of the accident.

It is not clear from the record as to just what was plaintiff's precise theory of Automation's liability, i.e., a defect in the design of the controls or a defect in the fabrication. As best we can discern plaintiff contends that the control system design which included a continuous operation capability, and in particular the inclusion of a certain switch, made it possible for the phantom wire to produce an unwanted engaging of the continuous operation mode, if that in fact was what happened.

We cannot say as a matter of law that the evidence was insufficient to support the verdict. We have concluded, however, that given the nature and weakness of plaintiff's evidence, the court's instruction to the jury on the doctrine of res ipsa loquitur and the effect of the settlement with C & K and D'Arcy deprived Automation of a fair trial and constituted reversible error.

"[R]es ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as *the extent of control exercised by the defendant*, the plaintiff's own conduct, the likelihood of negligence by some third person, and, in some situations, *evidence that the defendant is better able than the plaintiff to explain what happened.* All of these matters have been treated as aids to help the courts in determining whether the accident was of such a nature that the injury was more probably than not the result of the defendant's negligence." (*Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 446-447 [247 P.2d 344], italics added.)

Invoking of the doctrine requires three factual conditions: (1) the accident must be of a kind which ordinarily does not occur in the absence

of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff. (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].) When these conditions are satisfied a presumption of negligence is raised requiring defendant to produce evidence of his lack of negligence.

In the case at bench it is not difficult to conclude that the first condition was fulfilled, i.e., that the accident was one that ordinarily would not occur in the absence of someone's negligence. Although the experts could not really establish the precise cause of the malfunction, their testimony, combined with that of plaintiff's created an inference that someone had been negligent and that such negligence led to the accident in question. Also there is really no evidence that plaintiff was contributorily negligent.

■ Plaintiff's claim to the benefit of the doctrine of res ipsa loquitur, however, founders on the requirement that the instrumentality which caused the injury be under the exclusive control of defendant. Under the circumstances of this case there was, in fact, simply no proper role for the doctrine. Defendant was in no better position to explain the cause of the malfunction than was plaintiff.

■ Whether the plaintiff's case was cast in the principles of negligence or manufacturer's strict liability, plaintiff had the burden of proving that there was a defect in Automation's product, and that that defect caused the malfunction which led to his injury. Such proof was the essence of the products liability theory and such proof was also required before plaintiff could avail himself of the doctrine of res ipsa loquitur in pursuance of his negligence theory. Once plaintiff proved those facts, however, it would make no difference that defendant was negligent since liability would attach under the principles applicable to product liability unless the defect was one of design and defendant could show that the benefits outweighed the dangers. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

■ Here, the offending instrumentality was the punch press. That equipment had, in fact, been in possession of plaintiff's employer for many years before defendant had anything to do with it. Defendant installed one component of several modifications and subsequent thereto the machine was under control of plaintiff's employer for approximately four years. During that time it apparently worked perfectly.

Thus the key issue in the lawsuit was whether or not defendant's product had anything to do with plaintiff's injury. Defendant's product's involve-

ment was only one of several possibilities. Instructing the jury that from the *fact of the accident negligence on the part of defendant could be assumed* was tantamount to telling the jury that Automation's product was the *instrumentality that caused the injury and that said product was defective.*

Application of the doctrine of res ipsa loquitur is not warranted "where it is equally probable that the accident was caused by some fault for which the defendant was not liable and where it cannot be said that it is more likely than not that the accident was caused by the negligence of the defendant." (*Roddiscraft, Inc.* v. *Skelton Logging Co.* (1963) 212 Cal.App.2d 784, at p. 798 [28 Cal.Rptr. 277].)

The jury found that Natter was the principal cause of the injury— 55 percent at fault. They also found by their verdict in favor of Automation on the cross-complaint that both C & K and D'Arcy were actively negligent. From this it is clear that the probability that defendant's product caused the accident was less than equal to other probabilities.

The doctrine of res ipsa loquitur is designed to assist a plaintiff in establishing the element of *negligence* when it is shown that a defendant was in control of the thing that produced the injury. The doctrine cannot be invoked to establish the conditions precedent to its invocation, to wit, the identity of the instrumentality and the defendant's control thereof.

Having concluded that this case must be retried we need not discuss all of defendant's remaining contentions. We do, however, feel compelled, for the benefit of the trial court, to provide some guidelines for instructing the jury as to the sliding scale agreement pursuant to the requirements of Code of Civil Procedure section 877.5, subdivision (a)(2).[2]

That latter section was adopted as at least a partial solution to the problem of the collusive nature of such agreements and the unfair prejudice to the non-settling defendant. It requires the parties to such an agreement to advise the court of the terms of the agreement and requires the court, upon request, to tell the jury the essential nature of the agreement and "the possibility that the agreement may bias the testimony of the alleged tortfeasor or tortfeasors who entered into the agreement." This quoted portion embodies the spirit and purpose of the statute.

---

[2]The trial court had little, if no, direction in formulating a proper instruction. While the appellate courts of this state have dealt at length with attempting to define the nature of a "good faith" settlement (see *Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499 [203 Cal.Rptr. 825]; *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942 [187 Cal.Rptr. 376]; *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 38]), none have considered the characteristics of an appropriate instruction given in accordance with section 877.5, subdivision (a)(2).

In the case at bench the trial court gave the following instruction. "The court wishes to let the jury know before argument that there have been certain settlements made. [¶] Now, in this case the plaintiff has made a settlement with the defendants C & K Machine Tool Company and with D'Arcy, and the terms of this settlement have been disclosed to the court but will not be disclosed to the jury. However, I want to let you know that the essential nature of the agreements are that they are based on the responsibility of the parties. [¶] You are not to consider this fact of the settlements in determining the issues of liability. [¶] It has been found in this case by the court that the settlements were made in good faith by the parties and are not—do not involve any collusion or wrongful conduct of the parties."

 We think it manifest that the foregoing instruction, while attempting to fulfill the dictates of Code of Civil Procedure section 877.5, subdivision (a)(2), simply went too far in one direction and did not go far enough in the other direction.

In some fashion that instruction should have related to the jury the ways in which the agreement in question affected the relationship of the parties and the tenor of their testimony at trial. As given, it did nothing to obviate the concerns that motivated the Legislature to enact the disclosure portions of section 877.5.

The trial court's comment that the settlements had been made in "good faith" and were based on "the responsibility of the parties" were uncalled for and may have created the distinct impression that two of the defendants had reasonably opted to settle the matter to the extent that they were responsible while one, Automation, who was also liable, had unnecessarily proceeded to trial.

It is, of course, the province of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses. (See *Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d 51; *Gray* v. *Southern Pacific Co., supra,* 23 Cal.2d 632.) While evidence of a settlement agreement is inadmissible to prove liability (see Evid. Code, § 1152), it is admissible to show bias or prejudice of an adverse party. (*Zelayeta* v. *Pacific Greyhound Lines* (1951) 104 Cal.App.2d 716, 729 [232 P.2d 572].) Relevant evidence includes evidence relevant to the credibility of a witness. (Evid. Code, § 210.) In this case, the trial court's instruction simply failed to inform the jury that the agreement may have influenced the testimony of one or more parties.

Defendant Automation proposed an instruction which the trial court rejected but which in our opinion was a more appropriate statement of the

issue involved. That instruction read: "Plaintiff Moreno has entered into a settlement agreement with defendant D'Arcy and defendant C & K concerning the payment of money to plaintiff Moreno to compensate him for his injuries. The essential nature of the agreement is such that it will be advantageous to defendants D'Arcy and C & K for the jury to return a verdict against defendant [Automation]. Accordingly, the testimony of [the settling defendants' witnesses] may be biased in favor of plaintiff and against defendant [Automation]. The bias, if it exists, might appear either in what [the witnesses] said, or in what they failed to say."

The judgment is reversed.

Beach, J., and Gates, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 13, 1985. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.