Filed 8/14/14  Slothower v. No. California Inalliance CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| J. SCOTT SLOTHOWER et al., | C067330 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34200800013235CUPOGDS) |
| v. | |
| NORTHERN CALIFORNIA INALLIANCE et al., | |
| Defendants and Appellants. | |

Ryan Slothower, a developmentally disabled young man, lived in his own home with the help of caregivers.  One of these caregivers, defendant Robert Staples, was employed by defendant Northern California Inalliance (Inalliance).  During a struggle in June 2007 Staples broke Ryan's leg.  Ryan died following surgery at Kaiser Foundation Hospital (Kaiser Hospital).

Ryan's parents, plaintiffs Scott and Laure Slothower, brought suit against Staples and Inalliance for wrongful death.  A jury found Staples negligent and awarded the Slothowers $1.2 million in noneconomic damages.  Inalliance appeals, arguing the court erred in instructing on causation, expert testimony failed to establish the necessary standard of care, the court erred in not setting off plaintiffs' settlement with Kaiser

1

Hospital and in not allowing evidence of the settlement, and expert witness fees should have been recoverable.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2008 the Slothowers, Ryan's parents, filed suit against Inalliance and Staples for wrongful death.  Inalliance and Staples cross-complained against Kaiser Hospital and several of its employees for indemnity and contribution.

The Kaiser Hospital cross-defendants settled with the Slothowers for $30,000 plus an assignment to the Slothowers of Kaiser Hospital's medical lien of $145,000.  The Kaiser Hospital cross-defendants filed a motion requesting the court approve the settlement agreement under Code of Civil Procedure section 877.6.  The court granted the motion.  Before trial, the Slothowers made Code of Civil Procedure section 998 offers to compromise to Inalliance and Staples.  The offers were not accepted.

A jury trial followed.  The Slothowers filed a pretrial motion to exclude references to the settlement reached with Kaiser Hospital.  The court granted the motion.  The following evidence was introduced at trial.

### *Ryan Slothower*

At the time of the incident, Ryan was a 27-year-old man with severe developmental disabilities and mental retardation.  He lived in a home owned by his parents.  Ryan stood five feet three inches tall and weighed just over 100 pounds.

Ryan had certain likes and dislikes.  He loved working with paper.  Ryan became agitated if he got too hot and would indicate his discomfort by taking off his shirt.  Ryan's family and support staff kept the air conditioner on most of the time.

At times Ryan would act out.  Some disabled people communicate through behavior, since verbal communication may not be possible.  Ryan's mother was able to calm him down when he became agitated.  Inalliance caregivers generally found it easy to talk to Ryan and calm him down.  When Ryan acted out and threatened to injure himself, support staff used soothing words and a gentle touch to calm him down.

2

*Support for Disabled People*

The Lanterman Developmental Disabilities Services Act was enacted to ensure needed services to the developmentally disabled. (Welf. & Inst. Code, § 4500 et seq.) The act focuses on integrating the disabled into society and helping them become self-sufficient. (Welf. & Inst. Code, § 4501.)

The Alta California Regional Center is a community agency overseen by the California Department of Developmental Services. The center coordinates support services for the disabled in the Sacramento area through a network of service providers. These providers, also known as vendors, provide support services directly to the disabled.

*Southside Art Center*

One of the vendors serving Ryan was Southside Art Center (Southside), which provides vocational opportunities. Southside trains its staff in both behavioral and humanistic approaches to working with the disabled. A behavioral approach involves managing difficult behaviors; the humanistic approach involves treating the reasons for and causes of the behaviors. Under the humanistic philosophy, a person acts out when his or her needs are not being met.

In order to avoid physical approaches to behavioral problems, Southside trains its staff not to do anything that would escalate difficult behavior. Southside develops behavioral plans for its clients. Southside employees are trained that the plan has failed if staff physically restrains a client, since staff should never have to touch anybody. Staples was trained at Southside.

*Inalliance*

Inalliance is a private, nonprofit agency providing services to the disabled. Inalliance's program is designed to promote self-sufficiency and independence.

Inalliance's employee orientation manual, provided to in-home staff, states that consumers have the right to make decisions concerning the quality of their lives. The manual outlines a no-restraint policy for its clients.

The agency provided in-home support services for Ryan. During the week, Ryan attended the program at Southside about seven hours a day. When he returned home, Inalliance caregivers cared for him until the next morning. Inalliance also provided care on the weekends.

### Ryan's IPP

Alta California Regional Center developed an individual program plan (IPP) for Ryan, outlining services and goals. Each vendor serving Ryan tailored a plan.

Southside, Inalliance, and Ryan's family developed an IPP tailored to Ryan's personality and designed to outline the support he needed. The plan called for staff to be strong and calm. Ryan would become frustrated if staff were not patient with his speech issues. Under the plan, staff should not take things away from Ryan as a consequence of his behavior, and should not say "no" directly or Ryan would tune out.

### Robert Staples

Staples worked at Southside from 1999 until 2004 or 2005, when he began working for Inalliance. In the summer of 2006 he began providing support for Ryan two weekends a month.

At Inalliance, Staples was aware of the no-restraint policy. During his training, Staples was told never to physically manage any client. Instead, staff were trained to de-escalate difficult behaviors and avoid touching clients. Should physical restraint become necessary, the size of the person to be restrained must be taken into account to minimize the risk of injury. Staples weighed 225 to 230 pounds.

### The Incident

The only witness to the incident, Staples testified that on that afternoon, Ryan became agitated while talking to his sister on the phone. Ryan said he wanted paper. After Ryan hung up he tried to make another call, but Staples took the phone away. Staples said they could go get paper, but Ryan had to stop crying first. Ryan became more agitated and began to act out.

4

Ryan went into his room and continued to cry and ask for his mother. Staples stood outside the room; he did not consider calling Ryan's mother. Staples knew Ryan's mother was amenable to being called for help with Ryan and that she was always able to calm him down.

Staples then heard a bang in Ryan's room, and when he entered he saw Ryan sitting in a chair and picking at a hole in the wall. In order to get Ryan to stop, Staples threatened to take Ryan's wallet away. This technique was often effective.

Ryan kicked at Staples. In response, Staples determined he needed to "physically manage" Ryan. Staples was not in danger from Ryan's actions, and he did not move out of the way. Staples grabbed Ryan's right leg, and Ryan kicked at him with his left leg and slid out of the chair. Staples let go of Ryan's leg.

Staples grabbed Ryan's right leg again and tried to grab his left leg to put him on his side and "put him in the hold." As Ryan tried to push away, Staples testified, "[t]hen it was like pop. It was loud. It was -- I mean, it was loud. You heard it. I heard it. And then I could just feel in his body like -- I knew he was hurt."

Staples later told a paramedic that he and Ryan "were struggling; that there was a fall and that he -- Ryan hurt his knee."

Staples notified the Slothowers about the incident and they returned to the residence. When they arrived at the home, the Slothowers heard Ryan screaming. Ryan lay on the floor with his leg swollen to twice the size of normal. Despite Ryan's temperature sensitivity, the air conditioner was off and the inside temperature was 84 degrees. By around 5:00 p.m. Ryan had only had a coffee drink and a small bag of chips all day.

### Hospitalization and Surgery

Ryan was taken by ambulance to Kaiser Hospital, suffering from a closed multipart spiral oblique fracture. He underwent surgery under general anesthesia to repair his leg.

5

Surgery and anesthesia carry many risks, including death. A patient may experience aspiration, which is vomiting and taking the vomit into the lungs. Anyone who undergoes general anesthesia runs the risk of aspiration. Ryan suffered complications from the surgery and developed adult respiratory distress syndrome. Eleven days after the incident, Ryan died.

### Dr. Brendan Carvalho's Testimony

Dr. Brendan Carvalho, an anesthesiologist, testified he had reviewed Ryan's case. He does not work for Kaiser Hospital. Carvalho testified regarding Kaiser Hospital's care of Ryan. Carvalho stated hospital employees proceeded in a manner well within the standard of care. They had no difficulty intubating Ryan and gave him a small dose of Versed, a sedative, and fentanyl. There was a brief period of oxygen desaturation.[1]

Based on the tests Carvalho reviewed, Ryan appeared extubatable. There was no evidence the extubation was rushed. According to Carvalho, it is difficult to keep the tube in a patient, and you need a definite reason to delay extubation. The decision to extubate is a judgment call, and in Ryan's case the standard of care was met when the decision was made to extubate. In a patient with Ryan's history, the tube should not be left in longer than necessary because it could cause swelling and other problems, including infection. Less is better in terms of how long to leave the tube in.

A patient like Ryan is difficult to keep comfortable with a tube in; therefore, sedatives would have been required. Moving Ryan to a recovery room bed from the operating table was a judgment call. In nonelective surgery the risk of aspiration of stomach contents is high. To combat this, hospital staff inserted a tube with a cuff to prevent food from going into the lungs.

---

[1] Although Inalliance claims the use of the sedative caused Ryan to have a "severe adverse reaction," Carvalho testified that Ryan's level of oxygen saturation was not critically low.

Carvalho testified there were a number of references in the record to the possibility that Ryan might have problems and need an extra monitoring plan for both intubation and extubation. Carvalho stated, after reviewing the record, that it "looked like there was a plan both with intubation as well as extubation." The standard of care did not require Ryan to be taken to the recovery room on ventilation.

After Ryan was moved to the recovery room, the decision was made to reintubate him. However, staff experienced difficulty in reintubating Ryan. Gagging caused by reintubation, Carvalho testified, means the patient has the ability to prevent food from entering the lungs. Prior to the operation, hospital staff were able to ventilate Ryan without difficulty. The latter inability to ventilate could not have been predicted.

Carvalho discussed the difficulty in ventilating Ryan: "[C]learly, the patient had hypoxic problems, so oxygenation problems. And the reason could be a number of things that's been proposed, and I can go through a whole differential why his lungs were problematic, but it could have been anything, like we mentioned, that there may have been aspiration at some point either at the intubation or at the extubation.

"There could have been complications during the surgery. Sometimes you can get emboli, so bits of tissue shooting . . . with long bone fractures, so that could have gone into his lung. Pulmonary embolus is always something we think of. There's a whole differential for why he may have become hypoxic.

"And clearly, this was more than just respiratory depression where they were struggling to ventilate him. Looked like he had underlying lung problems because the X-ray and everything subsequent reflected that. [¶] . . . [¶]

". . . It's very rare when you have an absolute diagnosis. So there's always possibilities and then you go through all of those and you try and work out with your judgment what the most likely one is. And it's really a judgment call."

Carvalho testified that fat emboli are common with long-bone fractures. Orthopedic surgery increases the risk of an embolus. Pulmonary emboli are unrelated to anesthesia.

After reviewing Ryan's records, focusing on anesthesia, Carvalho testified Kaiser Hospital employees met the standard of care at every juncture. During cross-examination, Carvalho acknowledged Ryan's records stated that he had been sensitive to sedatives at age two and a half. Carvalho stated it took two hours to reintubate Ryan for a variety of reasons: the patient was uncooperative, he had a difficult airway, and attempts had to be brief because of the need to keep ventilating the patient. It was foreseeable that Ryan was going to have more problems and complications than the average patient.

### Dr. Mark Pham's Testimony

Dr. Mark Pham rendered anesthesia for Ryan during his surgery. Pham intubated Ryan because he was an urgent case. Because of the risk that any food in Ryan's stomach could cause nausea, the tube had a cuff to prevent matter from getting into the lungs. Intubation was surprisingly easy. Pham remained for 30 minutes and then a nurse anesthetist remained to extubate Ryan at the appropriate time.

After Ryan was extubated, he was transferred to recovery. During transport, Ryan's oxygen levels began to drop and he needed assistance breathing. The difficulty could have been caused by air emboli, common in long-bone surgery; the contents of his stomach having gone into his lungs; or underlying pulmonary problems. Pham returned within minutes, ordered a reversal agent for the narcotics previously taken, and waited to see if Ryan's oxygen level improved. When it did not, Ryan was reintubated. Reintubation proved difficult, and multiple attempts were necessary. These attempts did not cause Ryan further injury. Ryan kept breathing during the attempts. In Pham's opinion, the injury to Ryan's lungs was the result of the general anesthesia and the long bone fracture risk "[t]hat comes with the territory, unfortunately."

8

### *Dr. Michael Klein's Testimony*

An orthopedic surgeon, Dr. Michael Klein, reviewed Ryan's X-ray and determined there had been a high-energy event that produced an "explosion of tissue." Ryan's fracture resulted from a high-impact trauma, such as when a car strikes someone or when the bone is bent around a fulcrum, a fixed point. According to Dr. Klein, it was "anatomically impossible" for Ryan's leg to have been injured in the manner Staples described in his testimony. Instead, Dr. Klein testified the injury resulted from the leg being deformed against the arm of the chair by great force.

### *Dr. James Voigtlander's Testimony*

Dr. James Voigtlander, the orthopedic surgeon who operated on Ryan's leg, testified. Voigtlander stated Ryan's type of fracture "is typically from a higher energy type of force applied to the limb. Most commonly it's motor vehicle accidents . . . or motorcycle accidents. Certainly seen it with boating accidents, rodeo accidents, things like that where a tremendous amount of force is applied to break a femur bone. It's the largest bone in the body and takes a lot of force to break that bone." A leg pulled against the arm of a chair to create a lever point could cause such a fracture.

Voigtlander was present when Ryan was extubated. Ryan's oxygen saturation level dropped, which is not unusual. As Ryan was moved to the recovery room, the level dropped again. The decision was made to reintubate Ryan, which proved problematic. Voigtlander stated surgery always involves life-threatening risks, but an untreated long-bone fracture requires three to six months of bed rest or traction, which also involve risk.[2]

---

[2] Inalliance argues another orthopedist, Robert Mitchell, M.D., noted Ryan had a history of airway problems and respiratory depression that precluded the use of sedation in all but life-threatening emergencies. However, Voigtlander testified he did not recall Mitchell's written note or whether Mitchell had informed him of any possible problems in treating Ryan.

### Nurses' Testimony

Two nurses who cared for Ryan testified. Nurse anesthetist Alexandrina Braica testified the intubation was uneventful. When Ryan began to experience oxygen desaturation, she repositioned his airway. Ryan began breathing and recovered quickly. Desaturation is typical for a patient who has been given sedatives, as Ryan was. Braica stated not everything that was done was written down and that although they had the tools ready for a difficult intubation they were not needed.

Nurse anesthetist Gary Jenkins relieved Braica and took over Ryan's care. Jenkins administered the reversal agents and stated Ryan had normal readings for someone coming out of surgery. Ryan met the criteria for extubation. Leaving the tube in presented risks.

Jenkins believed Ryan could be safely moved into the recovery room. However, shortly after, Jenkins noticed Ryan had begun to have breathing problems. Dr. Pham returned and gave Ryan some Narcan. They had difficulty reintubating Ryan, and when they were successful, Ryan's condition remained the same.

### Testimony from Inalliance

Inalliance's program director for supported living, Donna Bettencourt, testified Inalliance's employee manual instructs employees that clients have the right to control what happens in their homes. In Ryan's case, that would mean making paper available to him and not escalating his behavior by withholding paper.

Bettencourt stated Staples violated Inalliance's policy by "attempting to put hands on somebody to calm them down" and fired him. When asked whether she believed Staples did what he could to keep Ryan safe, Bettencourt answered "No." Under Inalliance's policy, physical restraint should not be used. Restraining a client's leg would violate company policy.

Another Inalliance employee, Contessa Edwards, who had worked with Ryan, demonstrated how a staff member would calm a client such as Ryan by using soothing

10

words and a gentle touch. When Ryan was crying, words would calm him down. If Ryan was acting out, gentle physical contact might be necessary to prevent him from injuring himself.

Another of Ryan's caregivers, Brian Volpi, testified that he had never restrained Ryan. Restraint was not allowed under Inalliance's policies. Threatening to take away Ryan's keys or wallet would only escalate the situation.

### *Southside Testimony*

Southside's executive director trained Staples. As part of that training, Staples was told he "should never have to touch somebody." Instead, the goal was to figure out the cause of the behaviors and to de-escalate the behaviors before physical restraint was required. The director also taught Staples that if physical restraint was necessary, it should be done by two people similar in size to the client to avoid injury.

### *Nonsuit*

After plaintiffs rested their case, defendants moved for a nonsuit, contending plaintiffs had not designated experts to testify on cause of death, the standard of care, and breach. The court denied the motion, concluding: "I don't agree that expert testimony is required in this case, and I think there's been adequate testimony with respect to establishing the nature of and the cause of death of Ryan . . . ."

### *Defense Case*

#### Dr. David Downs' Testimony

Dr. David Downs, an anesthesiologist, testified that Kaiser Hospital's treatment of Ryan fell below the standard of care in at least two areas. According to Downs, Kaiser Hospital fell below the standard of care in its decision as to when to awaken Ryan and also in deciding when to remove the endotracheal tube.

Downs based his assessment on his review of Ryan's medical records. These records, Downs stated, provided red flags based on past incidents that Ryan needed prolonged ventilation after surgery. The records also revealed Ryan was sensitive to

sedatives. Even though these incidents occurred when Ryan was a very young child, because of his special needs, they should have alerted Kaiser Hospital that there might be difficulties with the extubation.

Downs also cited Ryan's preoperation reaction to Versed as an indication that past sensitivity was still present. In addition, the extubation criteria were not met, since Ryan lacked the ability to breathe on his own. His history should have alerted Kaiser Hospital of this problem. Kaiser's inappropriate extubation breached the standard of care. Downs testified Ryan's femur fracture did not cause the injury to his lungs, nor did the operation to repair his femur cause the lung injury. In Downs's opinion, Kaiser Hospital employees should have had a plan for Ryan's extubation. Premature extubation caused Ryan to aspirate and caused his lung injuries.

### *Special Verdict Form*

The parties and the court discussed the verdict form off the record. In court, defendants objected to the court's refusal to ask for special findings on superseding cause. The parties approved the verdict form given. The form required the jury to make six findings: (1) Whether Staples was negligent; (2) If he was, whether his negligence was a substantial factor in causing Ryan's death; (3) Whether Kaiser Hospital nurses and/or physicians were negligent; (4) If they were, whether their negligence was a substantial factor in causing Ryan's death; (5) What amount of money would compensate the Slothowers for the loss of Ryan's care, comfort, society, and companionship; and (6) Assuming 100 percent represented the full liability for negligence or wrongful conduct that caused Ryan's death, what percentage was attributable to defendants and what percentage to Kaiser Hospital's physicians and/or nurses?

### *Verdict*

The jury rendered a verdict finding that Staples was negligent and that his negligence was a substantial factor in Ryan's death. The jury also found Kaiser Hospital not negligent. The jury assigned 100 percent of the fault to defendants and no fault to

12

Kaiser. It awarded the Slothowers $1.2 million in noneconomic damages. The trial court awarded the Slothowers costs, including expert witness fees. (Code Civ. Proc., § 998.)

### New Trial Motion

Defendants filed a motion for a new trial and a motion for judgment notwithstanding the verdict. Defendants argued the court erred in instructing the jury on Kaiser Hospital's role in Ryan's death, that the Slothowers failed to meet their burden of proof by failing to offer expert testimony on the standard of care, and that defendants were entitled to offset the judgment by the amount of the Kaiser Hospital settlement. The court denied the motions. Defendants filed a timely notice of appeal.

## DISCUSSION

### Instructional Error

Defendants argue the trial court's failure to give requested instructions on causation prevented them from presenting their theory of the case, denying them a fair trial. Under defendants' theory, Ryan suffered two distinct injuries: a broken femur and an injury to his lungs. At trial, defendants contended that Kaiser Hospital's conduct was a substantial factor in causing Ryan's lung injury subsequent to his broken leg. Defendants assert: "Ryan would have survived but for the unexpected incompetence of Kaiser Hospital staff in addressing and protecting against Ryan's known risk for respiratory failure."

**Background**

Out of the jury's presence, the court and the parties discussed proposed jury instructions. At the conclusion of the discussions, the court noted: "[I]t's the understanding of the Court, and correct me if I'm wrong counsel, but with respect to the jury instructions which are going to be given by the Court, there are no objections -- there are some objections to proposed jury instructions by defense counsel, as I understand it, that the Court does not propose to give and . . . I have asked defense counsel to put that

13

on the record and make a record with respect to what he feels should be given which the Court has indicated it will not give."

Defendants requested four instructions on causation and responsibility that the court declined to give. Defense counsel agreed to the proposed instructions the court did give.

### Instructions Proposed by Defendant But Not Given

Defense counsel requested an instruction on apportionment of responsibility. (CACI No. 406.) The proposed instruction states: "Defendants claim that the negligence of Kaiser contributed to plaintiffs' harm. To succeed on this claim, defendants must prove both of the following:

"1. That Kaiser was negligent; and

"2. That the negligence of Kaiser was a substantial factor in causing plaintiffs' harm.

"If you find that the negligence of more than one person including defendants, plaintiffs and Kaiser was a substantial factor in causing plaintiffs' harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person on the verdict form. The percentages must total 100 percent."

Defense counsel also requested CACI No. 431, an instruction on causation, which states: "A person's negligence may combine with another factor to cause harm. If you find that defendants' negligence was a substantial factor in causing plaintiffs' harm, then defendants are responsible for the harm. Defendants cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing plaintiffs' harm."

Another requested instruction, CACI No. 432 (causation: third-party conduct as superseding cause) states: "Defendants claim that they are not responsible for plaintiffs' harm because of the later misconduct of Kaiser. To avoid a legal responsibility for the harm, defendants must prove all of the following[:]

14

"1.  That Kaiser's conduct occurred after the conduct of defendants;

"2.  That a reasonable person would consider Kaiser's conduct as a highly unusual or an extraordinary response to the situation;

"3.  That defendant did not know and had no reason to expect that would act Kaiser [*sic*] in a negligent manner; and

"4.  That the kind of harm resulting from Kaiser's conduct was different from the kind of harm that could have been reasonably expected from defendants' conduct."

Finally, defense counsel requested CACI No. 434, on alternative causation:  "You may decide that more than one of the defendants was negligent, but that the negligence of only one of them could have actually caused plaintiffs' harm.  If you cannot decide which defendant caused plaintiffs' harm, you must decide that each defendant is responsible for the harm.

"However, if a defendant proves that they did not cause plaintiffs' harm, then you must conclude that defendant is not responsible."

### *Instructions Given*

The court gave a modified form of BAJI No. 1466, informing the jury that if the defendants were found liable, they must also be found liable for aggravation of the injury or any additional injury caused by subsequent negligent medical care.  The court instructed:  "If you find that the defendant Robert Staples is liable for the original injury to the decedent, Ryan Slothower, then defendant Robert Staples is also liable:

"(1) For any aggravation of the original injury or for any additional injury caused by negligent medical or hospital treatment or care of the original injury."

The court also instructed the jury on defendants' claim that Kaiser Hospital personnel were negligent and caused Ryan's death.  In addition, the court gave instructions on proving medical negligence.

15

**Discussion**

Inalliance argues the court committed prejudicial error by refusing its requested instructions on alternative causation. According to Inalliance, "These jury instructions would have enabled the jury to consider *alternative* causes of Ryan's ultimate death, including the acts of Kaiser. Without hearing these instructions, the jury was without knowledge of how to apportion liability among several tortfeasors, without knowledge of the role of superseding causes and when they applied, as well as without knowledge of the role of alternative causation. Without hearing instruction as to alternative means of assessing causation, it is no wonder the jury found Kaiser not to be negligent and apportioned full liability on [defendants] - the jury was not provided with any instructions which would have instructed them otherwise." In addition, Inalliance contends, the court compounded the error by instructing the jury that it should treat the negligence of Kaiser Hospital as having been caused by defendants.

A party is entitled upon request to correct, nonargumentative jury instructions on every theory advanced by the party that is supported by substantial evidence. However, the trial court is not required to give instructions that are not correct statements of the law or that are incomplete or misleading. (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242.)

A superseding cause is an act of a third party or other force that by its intervention prevents the actor from being liable for harm to another which his or her antecedent negligence is a substantial factor in bringing about. The doctrine requires more than mere negligence on the part of the intervening actor. The fact that the third person's intervening act is done in a negligent manner does not make it a superseding cause if a reasonable person, knowing the situation existing when the act of the third person is done, would not consider the act highly extraordinary, or if the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent. (*Perez v. VAS S.P.A.* (2010) 188 Cal.App.4th

16

658, 680-681 (*Perez*).) Thus, "the defense of 'superseding cause,' . . . absolves a tortfeasor, even though his conduct *was* a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.)

Third party negligence that is the immediate cause of an injury may be viewed as a superseding cause when it is so highly extraordinary as to be unforeseeable. (*Perez*, *supra*, 188 Cal.App.4th at p. 681.) The intervening act of a third party does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing. (*Davis v. Erickson* (1960) 53 Cal.2d 860, 863.) This requirement focuses on the foreseeability of the " ' "risk of harm, not of the particular intervening act." ' " (*Perez*, at p. 681, italics omitted.)

" '[I]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' [Citations.]" (*Koepke v. Loo* (1993) 18 Cal.App.4th 1444, 1449.) Here, the actions taken by Kaiser Hospital, administering the Versed, intubating and extubating Ryan, and moving him to the recovery room, were by their very nature foreseeable consequences of Staples's conduct. These alleged acts were classic examples of the types of hazards that made Staples's conduct negligent.

Inalliance argues legal causation is a question of fact for the jury. However, when undisputed facts leave no room for a reasonable difference of opinion, there is no issue for the jury to resolve. (*Lawson v. Safeway Inc.* (2010) 191 Cal.App.4th 400, 417; *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1035.) Under the circumstances of this case, we agree with the trial court that the superseding cause doctrine does not apply because the foreseeability issue was resolved against Inalliance as a matter of law.

17

## *Sufficiency of the Evidence*

Inalliance argues that since the Slothowers alleged caregiver professional negligence, they were required to call an expert to testify as to the standard of care and breach of that standard. At trial, after the Slothowers failed to present expert testimony on the standard of care for a professional caregiver, Inalliance moved for nonsuit. The trial court disagreed that the facts required expert testimony and denied the motion.

On appeal, Inalliance renews its contention that when negligence is based on the skill of a professional, the plaintiff must present expert testimony in order to sustain the burden of proof. According to Inalliance, "This is particularly true of the methods, techniques and training relating to how to control and mitigate the risk of injury to a developmentally disabled adult engaged in violent behavior." The lack of such testimony renders the evidence insufficient to establish Staples's negligence.

Inalliance contends the standard of care applicable to professional care services requires expert testimony because the duties are beyond the common knowledge of the layman. According to Inalliance, "It is beyond the common experience of jurors to know what behavioral control techniques should have been employed when Ryan engaged in his violent outburst.

". . . An assessment of Robert Staples' conduct is dependent upon specialized knowledge of the developmentally disabled and of the responsibilities of the direct service care provider." Specifically, Inalliance argues, "[i]t is beyond the common experience of jurors to know what behavioral control techniques should have been employed when Ryan engaged in his violent outburst."

We review a trial court's decision on the necessity for expert testimony under the abuse of discretion standard. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118 (*Guerra*).) We review the denial of a motion for nonsuit under the substantial evidence test. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263.)

18

As a general rule, expert witness testimony is required in a professional negligence case to establish the applicable standard of care, whether that standard was met or breached by the defendant, and whether the defendant's negligence caused the plaintiff's damages. However, such expert testimony is not required where the issue is within the common knowledge of the jury. (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542.)

We cannot find the trial court abused its discretion when it determined no expert testimony was necessary under the facts of the case. In addition, we find substantial evidence in support of the court's denial of Inalliance's motion for a nonsuit.

At trial, Inalliance's program director for supported living, Bettencourt, testified that Inalliance did not allow physical restraints and that a "hands on" approach to controlling patients violated company policy. Bettencourt also testified Inalliance staff should not do anything to escalate a patient's adverse behavior. She testified that if Ryan was crying for paper, Staples should not have escalated the situation by withholding paper.

Several other Inalliance employees testified regarding the incident and Staples's conduct. Volpi testified that threatening Ryan would only "exacerbate the situation." Edwards testified that when Ryan cried, talking would calm him down. When Ryan acted out in ways that could lead to injury, such as banging his head, gentle physical contact was necessary.

In addition, Rhoades, Southside's executive director, testified that staff should never have to touch somebody. According to Rhoades, if physical restraint became necessary, the size of those providing the restraint, as well as the size of the person being restrained, would have to be considered to avoid potential injury.

Finally, the jury was informed that Inalliance's policy stated: "There's currently no authorization to apply physical restraints to any of the people we support." Despite this stated policy, Staples testified that although he knew Ryan would become upset if he didn't get paper, Staples withheld paper, exacerbating Ryan's behavior. Staples also

19

testified he tried to "physically manage" Ryan and told a responding paramedic that Ryan was hurt when Staples struggled with him and they fell.

In medical negligence cases, expert testimony is required "only if the facts clearly show that the procedure is so unusual and complex that the jury could not rest their understanding of it upon their common knowledge." (*Bardessono v. Michels* (1970) 3 Cal.3d 780, 790.) Here, the facts before the jury concerning Staples's alleged negligence were not "so unusual and complex" as to be beyond the understanding or knowledge of the jury. In *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, caregivers knew the plaintiff, a patient, ran the risk of falling and required assistance walking. The plaintiff requested aid to go to the bathroom. A nurse helped him into a walker and then left, stating he would be right back. When the nurse failed to return, the plaintiff attempted to walk to the bathroom and fell, fracturing his back. (*Id*. at p. 693.) We held that expert opinion was not required to establish the nurse's negligence, since both the standard of care and the breach were within the sphere of knowledge and obvious to the average person. (*Id*. at pp. 694-696.) We find the facts before us in the present case compel the same result.

### *Offset of the Kaiser Hospital Settlement Against the Damage Award*

Inalliance argues the trial court failed to apply a set-off of the Slothowers' settlement with Kaiser Hospital to the jury's damage award. Kaiser's settlement was $30,000 in cash plus an assignment of Kaiser's $145,158 lien to the Slothowers. The settlement totaled $175,158. Under Code of Civil Procedure section 877, Inalliance contends, the court was required to reduce the judgment.

Section 877 of the Code of Civil Procedure provides, in part: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . it shall have the following effect:

20

"(a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is greater." Inalliance argues the court refused to reduce the amount of the Kaiser Hospital settlement as required under the statute.

However, Civil Code section 1431.2, subdivision (a) states that liability for noneconomic damages is several only and not joint. Under section 1431.2, subdivision (a), each defendant is liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment will be entered against that defendant for that amount. "[A] personal injury plaintiff's valid 'claim' against one such tortfeasor for noneconomic damages can never be the liability of 'the others.' " (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 274.) Therefore, one tortfeasor's pretrial settlement of a noneconomic damage claim is not payment of a claim for which the other tortfeasors might ever be jointly and severally liable. (*Id*. at pp. 274-275.)

Here, the jury awarded only noneconomic damages, finding Inalliance 100 percent at fault and Kaiser zero percent at fault. On appeal, Inalliance renews its claim that "the value of the Kaiser settlement must have contained some amount which represented Kaiser's proportionate share of non-economic damages[; therefore] this award by the jury was improper and should have been offset by the trial court. Without this offset, plaintiffs are receiving a recovery of more than 100%. This is contrary to the law of comparative fault and, for this reason, the trial court erred in refusing to permit an offset."

In *McComber v. Wells* (1999) 72 Cal.App.4th 512, the court firmly rejected this argument: "We find disingenuous Wells's . . . argument [that] the judgment for noneconomic damages is subject to an offset from the pretrial settlements. All the cases upon which Wells relies when discussing economic damages also plainly say the same rules do not apply to noneconomic damages. [Citations.] '[E]ach defendant is solely

21

responsible for its share of noneconomic damages under Civil Code section 1431.2 [Proposition 51]. Therefore, a nonsettling defendant *may not receive any setoff* under section 877 for the portion of a settlement by another defendant that is attributable to noneconomic damages.' [Citation.]" (*McComber*, at p. 518.) The court did not err in refusing to offset the Kaiser Hospital settlement against the damage award.

### Admissibility of the Kaiser Hospital Settlement

Inalliance contends the trial court erred in granting the Slothowers' motion to exclude evidence at trial of their settlement with Kaiser Hospital. Inalliance argues the Kaiser Hospital settlement was admissible to show bias on the part of the Slothowers' expert witness, Dr. Carvalho. In addition, Inalliance argues the trial court was required under Code of Civil Procedure section 877, subdivision (a) to offset the damages awarded against them by the amount of the Slothowers' pretrial settlement with Kaiser Hospital.

We review a trial court's evidentiary rulings for an abuse of discretion. We will not disturb the court's ruling unless the trial court exercised this discretion in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*Guerra*, *supra*, 37 Cal.4th at p. 1113.)

As Inalliance acknowledges, evidence of settlements is inadmissible to prove liability. (Evid. Code, §§ 1152, 1154.) Instead, Inalliance argues, the settlement was admissible to impeach the testimony of the Slothowers' expert, Dr. Carvalho, who testified that Kaiser Hospital employees who tended Ryan were not negligent. The exclusion of evidence of Kaiser Hospital's settlement with the Slothowers, Inalliance claims, constitutes an abuse of discretion.

However, at its root, the evidence Inalliance seeks to have admitted is basically that Kaiser was in some way liable for Ryan's injuries. Inalliance argues the court erred in excluding testimony regarding the Kaiser Hospital settlement "given that the court had already granted a motion for good faith settlement, which could *only* be brought by a joint tortfeasor, i.e., a party *at least* proportionately at fault."

22

Inalliance contends a witness's settlement with a party is admissible to show the witness's bias or prejudice, citing *Moreno v. Sayre* (1984) 162 Cal.App.3d 116, 126 (*Moreno*). Therefore, Inalliance should have been permitted to ask Dr. Carvalho whether the Slothowers' settlement with Kaiser Hospital influenced his testimony.

However, *Moreno* considered a sliding scale settlement agreement, in which the settling defendant's exposure depended upon the outcome of the trial against the nonsettling defendant. When a defendant enters into a sliding scale settlement with a plaintiff and later testifies against the nonsettling defendant, the court may disclose to the jury the existence and contents of the settlement agreement to inform the jury of possible witness bias. The trial court may instruct the jury that the witness has an interest in maximizing the damages awarded to the nonsettling defendant. (*Moreno*, *supra*, 162 Cal.App.3d at pp. 126-127; Code Civ. Proc., § 877.5, subd. (a)(2).) No such sliding scale settlement appears in the present case. *Moreno*'s logic does not apply. The court did not err in excluding evidence of the Slothowers' settlement agreement with Kaiser Hospital.

### *Expert Witness Fees*

Finally, Inalliance claims the trial court improperly awarded the Slothowers expert witness fees under Code of Civil Procedure section 998. Section 998, subdivision (c)(1) states, in part: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer." The awarding of expert fees under section 998 lies within the discretion of the trial court and we can only set aside such an award if the court abuses that discretion. (*Hilliger v. Golden* (1980) 107 Cal.App.3d 394, 397 (*Hilliger*).)

The jury awarded the Slothowers $1.2 million. Inalliance argues the Slothowers served two offers to compromise, one on each defendant in the amount of $649,999, for a

23

total of $1,299,998. Citing *Hilliger*, Inalliance contends that these offers superseded the Slothowers' earlier offer to compromise.

Inalliance reasons that since the verdict form required the jury to make a finding that if defendant Staples was liable then defendant Inalliance was liable, Staples and Inalliance were not to be considered separately when it came to the offers to compromise under Code of Civil Procedure section 998. Given that defendants were considered for liability jointly on the verdict form, the section 998 offers to each of them must be combined. Therefore, the total value of the section 998 offer to defendants of $1,299,998 was more than the verdict amount of $1.2 million, and the Slothowers were not entitled to recover $16,800 in expert witness fees.

We disagree. In *Hilliger*, *supra*, 107 Cal.App.3d 394, a plaintiff injured in a car accident served two separate offers on two defendants: $14,999.99 for the driver and $9,999.99 for the car's owner. The defendants rejected the offers, and following trial the verdict was against the defendants jointly for $15,000. The trial court denied the plaintiff expert witness costs under Code of Civil Procedure section 998 because the judgment was less than the two offers combined. (*Hilliger*, at p. 396.)

The appellate court reversed. The court found the interests of the two defendants identical; both were joined in the action; the judgment was not apportioned; and the offers were single, separate, and unconditional offers to each of the defendants. (*Hilliger*, *supra*, 107 Cal.App.3d at pp. 399-401.) The court also noted: "To disallow to appellant her costs expended for expert witnesses testifying at trial would thwart the tenor and the spirit of the law under which an offer to compromise is made." (*Id*. at p. 400.)

As in *Hilliger*, the Slothowers made separate offers to two distinct defendants. The offers cannot be aggregated for purposes of Code of Civil Procedure section 998. We are not persuaded by Inalliance's attempt to distinguish *Hilliger* by pointing out the two offers in *Hilliger* were made months apart while the offers in the present case were

made concurrently. We cannot find this distinction undermines *Hilliger's* applicability to the present case.

Nor do we find Inalliance's reliance on *Burch v. Children's Hospital of Orange County Thrift Stores, Inc.* (2003) 109 Cal.App.4th 537 compels a different result. When a plaintiff submits a Code of Civil Procedure section 998 offer in a case with multiple defendants, the offer to any defendant must be sufficiently specific to permit the defendant to determine the exact amount the plaintiff is seeking from him or her. (*Taing v. Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579, 586.) In *Burch*, the court found an unapportioned, lump-sum offer to multiple defendants too uncertain to allow a particular defendant to determine the exact amount sought from that defendant. (*Burch*, *supra*, 109 Cal.App.4th at pp. 545-548.) Here, there is no lump sum, but two separate section 998 offers, one to each defendant.

## DISPOSITION

The judgment is affirmed. The Slothowers shall recover costs on appeal.

<u>       RAYE       </u>, P. J.

We concur:

<u>     BLEASE     </u>, J.

<u>     ROBIE      </u>, J.

25